IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| JANICE BAKE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 07 C 6600 |
| | ) | Judge Der-Yeghiayan |
| | ) | Magistrate Judge Cox |
| LIFE INSURANCE COMPANY | ) | |
| OF NORTH AMERICA, | ) | |
| | ) | |
| Defendant. | ) | |

**PLAINTIFF'S RESPONSE TO DEFENDANT'S
LOCAL RULE 56.1 STATEMENT OF FACTS**

Plaintiff, JANICE BAKE, submits this response to Defendant's Local Rule 56.1
Statement of Facts:

**I. Parties, Jurisdiction and Venue**

1.    Plaintiff, Janice Bake ("Bake"), is a former employee of Corus Bankshares, Inc.
("Corus"). (Administrative Record at 740).

**Response:**    Plaintiff objects to the characterization of an insurance claim file as an
"administrative record" and further objects to the hearsay nature of the document.  In the event
the court overrules the objection, paragraph 1  is admitted.

2.     Bake participated in an employee welfare benefit plan ("the Plan") that Corus
established to provide employees with long-term disability ("LTD") benefits. (736).

**Response:**    Admit the fact that Bake received group long-term disability insurance
coverage under a policy of insurance underwritten by LINA for the benefit of Corus employees.

3.    LINA insures LTD benefits under the Plan pursuant to Group Policy No. LK-
960120 ("Policy").  (740-41).

**Response:**    Admit that LINA is the insurer.

4.    The Court has jurisdiction of this case under the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1132(e), as well as 28 U.S.C. § 1331, because the Plan constitutes an "employee welfare benefit plan" within the meaning of 29 U.S.C. § 1002(1)(A).

**Response:**    Admitted.

## II. Relevant Provisions of the Policy

5.    The Policy defines "disability" and "disabled" as follows:

An employee is Disabled if, because of Injury or Sickness,

1.    he or she is unable to perform all the material duties of his or her regular occupation, or solely due to Injury or Sickness, he or she is unable to earn more than 60% of his or her Indexed Covered Earnings; and

2.    after Disability Benefits have been payable for 24 months, he or she is unable to perform all the material duties of any occupation for which he or she may reasonably become qualified based on education, training or experience. (373).

**Response:**    Admit this paragraph quotes a portion of the definition of "disabled" contained in the Policy.  Deny that it quotes the entire portion of section 2 of the definition, which provides in full:

2.    after Disability Benefits have been payable for 24 months, he or she is unable to perform all the material duties of any occupation for which he or she may reasonably become qualified based on education, training or experience, or solely due to Injury or Sickness, he or she is unable to earn more than 60% of his or her Indexed Covered Earnings.  (373).

6.    Before LTD benefits become payable, a participant must continuously meet the Policy's definition of "disability" for 90 days, a period referred to as the Benefit Waiting Period. (373).

**Response:**    Admitted.

7.      The monthly LTD benefit is the lesser of 60% of the employee's monthly Covered Earnings or the maximum benefit ($10,000), less Other Income Benefits paid or payable to her. (373).

**Response:**      Admitted.

### III. Bake's Claim for LTD Benefits

8.      As of January 2006, Bake was employed by Corus as First Vice President, Operations Analysis. (721-22, 741). The physical requirements of this occupation were limited to sitting and standing long periods of time, walking as necessary, creating and analyzing documents, and operating office and computer equipment. (*Id.*). The Dictionary of Occupational Titles ("DOT") classifies the occupation as sedentary. (719).

**Response:**      The first sentence is admitted.  Bake denies that the second sentence accurately characterizes all physical requirements of Bake's occupation, but rather contains only some of the "Essential Physical Requirements" provided by Corus's job description.  (722).  As to the third sentence, Bake admits that the DOT classifies the occupation of "Vice President, Financial Institution" in the sedentary strength category.  (719).   However, the truncated job description set forth above fails to point out that the occupation imposes significant cognitive demands and the ability to travel by car.

9.      For several years, Bake had had cervical and thoracic spondylosis, which is a degeneration of the joints between the vertebra of the spine. (350, 352). As of January 2006, the cervical spondylosis was resulting in cervical radiculopathy, a condition in which a pinched nerve in the neck caused pain to radiate to Bake's upper extremities. (154, 156, 501). On January 30, 2006, Dr. Bergin, the orthopedist, and Dr. Bovis, the neurosurgeon, performed a cervical

diskectomy, decompression, and anterior fusion at C5-6 and C6-7 to alleviate the radiculopathy. (154-58, 501).

**Response:**    Plaintiff objects to the citation of medical evidence in the file as hearsay; and this objection is made as to this paragraph and all subsequent paragraphs in Defendant's 56.1 Statement which cite to the medical evidence in the record.  Defendant declined Plaintiff's request to stipulate to the contents of the claim file in open court on June 5, 2008.  Thus, the claim file is hearsay and its contents fail to meet the requirements of Fed. R. Civ. P. 56(e)(1) as being admissible in evidence.  However, if the Court overrules the objection, Plaintiff's recitation of the contents of the medical records should be given equal consideration.

As to paragraph 9, the first sentence is admitted.  As to the second sentence, Bake has both thoracic and cervical radiculopathy, but the remainder of the sentence is denied as not supported by the cited portion of the record and is incomplete.  The third sentence is admitted.

10.    On February 21, 2006, Dr. Bergin noted that Bake's right arm felt markedly better while she still had numbness in the left. Her muscle groups in the upper and lower extremities were 5/5, meaning that she showed no sign of disuse atrophy. (701-704). The same day, Dr. Bovis stated that Bake had had complete relief of her pain and had no complaints other than an episode of chest pain and paresthesias in her hands, which were improving. (517).

**Response:**    Bake admits that the first two sentences reflect portions of a chart note from Dr. Bergin on February 21, 2006, but denies they fully, fairly, and accurately summarize and set forth Dr. Bergin's findings on that date.  Bake also objects to this paragraph to the extent it characterizes her condition as fully improved, as a subsequent letter from Dr. Bergin on April 4, 2006 noted "Initially she had almost complete resolution of her radicular symptoms but they came back to some extent especially in the right hand."  (703).  Bake admits the third sentence

reflects a portion of Dr. Bovis's note on February 21, 2006, but denies to the extent it potentially characterizes Bake's chest pain as improved.

11.     Bake returned to part time work at Corus and drew her full salary. (729, 734). However, on June 21, 2006, Bake stopped working. (741).

**Response:**     Admitted.

12.     In August 2006, Bake sent LINA a claim for LTD benefits under the Plan. (740). To determine whether Bake met the Plan's definition of disability, LINA sent Dr. Bovis and Dr. Bergin several requests for their records. (726, 728, 711, 715).

**Response:**     Admitted.

13.     Dr. Bergin produced his records around September 20, 2006. (Date stamps, 699-710). In an August 22, 2006 chart note, Dr. Bergin reported that: (a) Bake's diffuse pain and thoracic pain had improved. She had mild pain radiating to her right leg and calf. (710). (b) X-rays showed consolidating fusion at C5-C7 with no loosening of implants. There was no change in her thoracic spine. (710). (c) Bake had a normal heel-to-toe gait and a normal neurological exam. She showed no signs of focal neurological deficits. (710). (d) While noting that Bake's pain was being managed, Dr. Bergin asserted that she might be permanently unable to perform her job duties. He did not specify the cause of the alleged disability. (710).

**Response:**     The first sentence is admitted.   Bake admits the remainder of the paragraph cites portions of Dr. Bergin's chart note on August 22, 2006, but denies that the selectively cited portions accurately reflect the substance of Dr. Bergin's note on that date.   Dr. Bergin also noted Bake had lumbar radiculopathy and substantial numbness in her ulnar distributions.  (710).  Bake further denies that the August 22, 2006 note reflects the substance of all of the records Dr. Bergin submitted, which ranged from February 2006 through August 2006.

In a March 7, 2006 note, Dr. Bergin noted right shoulder pain and impingement, which he treated with a steroid injection. (702). In a letter dated April 4, 2006, Dr. Bergin noted that while Bake saw some improvement in her cervical spine, she was experiencing significant back pain in the thoracic region due to severe disc degeneration, and could not sit for long periods of time. (703-04). On April 14, 2006, Dr. Bergin noted ongoing thoracic back pain that was becoming "more and more debilitating," which physical examination, x-rays, and a bone scan confirmed. (705). On April 21, 2006, Dr. Bergin noted "intractable" thoracic back pain that interfered with Bake's work and daily activities, and physical exam showed tenderness and extenuation of thoracic kyphosis. (706). On May 5, 2006, Dr. Bergin noted a back brace was ineffective for Bake's thoracic pain, and physical examination showed increased kyphosis (curvature) around her thoracic spine. (707). On May 15, 2006, Dr. Bergin noted Bake was considering thoracic spine fusion. (708). On July 11, 2006, Dr. Bergin noted a great deal of degenerative and inflammatory changes in the thoracic spine (709). Dr. Bergin reported that despite more effective pain management, Bake remained unable to work due to her symptoms. (710).

14.    In a September 12, 2006 claim form, Dr. Bergin listed Bake's primary diagnoses as cervical radiculopathy with myelopathy (damage to the spinal cord) and thoracic kyphosis (curvature of the middle segment of the spine). (700). When the form asked what specific factors were affecting the patient's return to work, Dr. Bergin wrote "unable to look forward more than one half hour at a time, unable to use computer and keyboard, needs to change positions frequently, ulnar neuropathy [dysfunction of the nerve that runs under the ulna bone]." (700). He stated that Bake could not perform her job duties. (700).

**Response:**    Admit the first sentence states the diagnoses listed by Dr. Bergin, although the paragraph is denied in part as to the definitions of cervical radiculopathy and myelopathy –

according to Stedman's Medical Dictionary, "Radiculopathy refers to disease of the spinal nerve roots (from the Latin *radix* for root). Radiculopathy produces pain, numbness, or weakness radiating from the spine." Dorland's Medical Dictionary defines "myelopathy" as "any of various functional disturbances or pathological changes in the spinal cord." The rest of the paragraph is admitted.

15.    On September 13, 2006, Bake completed an activities questionnaire. (673). She reported that she typically woke up between 5:00 and 6:00 a.m. and went to bed between 11:30 p.m. and 12:00 a.m. Every day of the week, she cooked for 45 minutes to an hour, cleaned for five to 15 minutes, read for up to an hour, and watched television for two to four hours. She shopped twice a week for a couple of hours and engaged in other activities two to four hours per day five days a week. (673).

**Response:**    Denied.  This paragraph cites only a portion of the activities questionnaire Bake submitted and does not fully, fairly and accurately convey the limitations described.  Bake further reported she had numbness and partial loss of feeling in both hands, fingers, and arms that limit her ability use them.  (673).  She noted she cannot sit long because her legs and feet tingle.  *Id*.  She reported that pain and loss of balance cause her to drop things and prevent lifting and bending.  *Id.*  She also stated that sitting causes muscle spasms to her shoulder and neck.  *Id.*  Bake also advised LINA that her condition required her to use special equipment including stair rails, bath rails, and a service dog.  (673).  She added that she seldom used the computer due to neck pain and stiffness.  *Id*.

16.    Bake reported that she could drive for "20 or so" miles. She sometimes used a cane. For recreation, she trained her dog for obedience and for a service dog certification. (673). She went on walks of one half block to three blocks up to three times per day. (673). She did her

own personal hygiene. (*Id.*). She participated in physical therapy three to four times per week. (674).

    **Response:**    Admit this paragraph states a portion of the activities questionnaire, but Bake denies it fully reflects the entirety of that questionnaire.  See Response to No. 15 (above).

    17.    On October 12, 2006, Sherry Moyer, RN, analyzed Bake's records. Nurse Moyer concluded that, as of August 22, 2006, the records did not document functional deficits that precluded Bake from returning to her sedentary occupation. Nurse Moyer noted that Bake's right leg pain was mild, the thoracic pain had improved under Relafen (also referred to as Nabumetone), and x-rays showed solid fusion of the cervical discs. (697 citing Dr. Bergin's note at 710).

    **Response:**    As to the first sentence, Bake admits Ms. Moyer filled out a "file review" form on October 12, 2006, but Bake is without sufficient knowledge as to whether Ms. Moyer "analyzed Bake's records" as she referenced only an August 22, 2006 chart note (697).  Bake further questions Moyer's professional qualifications since she was reviewing records and reports completed by physicians, including Dr. Bergin who had completed a form provided by Defendant on which he certified Bake's inability to work at her occupation due to cervical radiculopathy, thoracic kyphosis, and ulnar neuropathy that together caused her to be unable to look forward more than half an hour at a time, use the computer and keyboard, and would cause the need to change positions frequently.  (697, 700).

    18.    Nurse Moyer recommended that the case manager obtain the assessment of Bake's rheumatologist, Erin Arnold, MD, before rendering a decision. (697).

    **Response:**    Admit that the document so states.

19.     On October 16, 2006, Dr. Arnold sent LINA a medical evaluation form. Dr. Arnold did not list any restrictions or limitations on Bake's ability to work. Dr. Arnold wrote "N/A" [not applicable] next to the questions: "What are the specific restrictions that you placed on your patient?" "What are the additional factors impacting return to work?" (685). The fax included a September 27, 2006 report in which Dr. Arnold noted that Bake had been working aggressively with physical therapy, had been doing well, and appeared well. (687).

**Response:**     The first, second, and third sentences reflect what is stated in the records; however, the statement does not fully, fairly and accurately state the evidence.  Bake objects to the characterization of Dr. Arnold's report as stating Bake had no restrictions; rather, Dr. Arnold noted "I take care of her osteopenia and CHANA" and therefore gave no opinion regarding Bake's work restrictions.  (687).  Although the fourth sentence of paragraph 19 recounts a portion of Dr. Arnold's September 27, 2006 report, it does not fully, fairly and accurately reflect the totality of that report.  Dr. Arnold also noted knee and back pain, numbness and pain in the cervical spine, and that on physical examination Bake had "redistribution of her symptoms." (687).

20.     On October 16, 2006, LINA's nurse case manager, Donna Simmons, RN, analyzed the medical evidence and wrote a report on Bake's condition. (681-82). Nurse Simmons noted that, as of August 2006, Bake's thoracic pain was improved, the radiculopathy to the right leg was mild, the SLR was negative, and there was no EMG/NCV (electromyography and nerve conduction velocity) testing that indicated upper extremity deficits secondary to radiculopathy. (681-82, citing Dr. Bergin's report at 710).

**Response:**     The first sentence describes what Ms. Simmons recorded, but Bake is without sufficient knowledge as to whether Ms. Simmons "analyzed the medical evidence" or

whether she even possesses appropriate professional qualifications to do so because her report lists only select portions of medical records.  (682).

21.    Further, Bake's lumbar kyphosis as of April 2006 was no worse than it was in November 2005. (682 citing Dr. Bergin's report at 705). Nurse Simmons concluded that the evidence did not show restrictions or limitations that precluded Bake from performing her occupation. (682).

**Response:**    Admit that the record so states, but Bake denies that the conclusion was fair, complete or accurate based on the selective focus on the lumbar region to the exclusion of the thoracic region of the spine and Bake's other medical problems.

22.    On November 3, 2006, LINA received records from Arminio Surucci, MD. (524-541). Nurse Simmons noted that the records did not include evidence, such as electromyography and nerve conduction velocity tests (EMG/NCV), showing impairments that would preclude sedentary work. (521-22, citing 524-541).

**Response:**    Plaintiff admits Ms. Simmons so indicated, but denies the accuracy of the statement as Ms. Simmons only noted there was no EMG/NCV testing to support a "grip deficit" impairment.  (522).

23.    In a letter dated November 8, 2006, LINA's claim manager, Michelle Miller, summarized Bake's medical history in detail. Miller denied Bake's claim for LTD benefits on the ground that the evidence did not show restrictions or limitations that prevented Bake from performing her sedentary occupation at Corus, and she therefore did not meet the Policy's definition of disability. (518-19).

**Response:**    Bake admits the statement is contained in the record, but denies the completeness, accuracy or fairness of the statement since Michelle Miller's qualifications are

unknown and her conclusions were contrary to the reports and assessments by Bake's principal physician, Dr. Bergin.  (700-10).

24.     After deciding the appeal, LINA received the records of Dr. Bovis, who had performed the diskectomy with Dr. Bergin. (495-517). Dr. Bovis's July 27, 2006 report stated that Bake had occasional right medial arm numbness and tingling. She had no weakness or other complaints. She was "entirely neurologically intact" and had a normal motor examination. (496).

     **Response:**     Admit that the record so states, but the cited provisions do not include all of the records provided by Dr. Bovis so the statement is denied.  Notes from May 18, 2006 and April 25, 2006 reflect pain and abnormalities in Bake's thoracic spine.  (497-98).

25.     In a September 7, 2006 report, Dr. Bovis stated that Bake's only complaint was ulnar nerve distribution and that this was unchanged from before the surgery. (495).

     **Response:**     Admit that the record so states.

26.     An MRI of Bake's brain and cervical spine were normal. The MRI showed no evidence of compression of the spinal cord. Dr. Bovis was quite pleased with her medical course as she had "shown complete healing after her anterior cervical diskectomy and fusion." (495).

     **Response:**     Admit this paragraph cites a portion of Dr. Bovis's September 7, 2006 report but denies the conclusion is relevant as to Bake's other medical problems, particularly with respect to her thoracic spine.

**IV. Bake's First Administrative Appeal**

27.     By letter dated February 21, 2007, Bake's counsel notified LINA that he intended to appeal the denial of benefits. (481-82). With the letter, Bake's counsel submitted an October 24, 2006 report in which Igor Rechitsky, MD listed Bake's diagnosis as left carpal tunnel syndrome. (484-86). Dr. Rechitsky stated that nerve conduction studies documented interval

11

worsening across the left wrist and very stable left ulnar neuropathy. However, Bake did not have brachial plexopathy (loss of movement or sensation in the arms), atrophies (loss of muscle mass due to immobility), or fasciculations (muscle twitching). Her motor examination was normal. (484).

**Response:**    The first two sentences are contained in the record and admitted. The rest of this paragraph is admitted to the extent it cites a portion of Dr. Rechitsky's report, but Bake denies the statement fully, fairly or accurately reflects the entirety of that report. Dr. Rechitsky also noted Bake experienced worsening numbness in her hands and that this was likely due to worsening left carpal tunnel syndrome. (684),

28.    Nurse Simmons and the case manager noted that Dr. Rechitsky had not found brachial sensory deficit, atrophies or fasciculations or otherwise documented restrictions that precluded sedentary work. (647, 650 citing 484).

**Response:**    Admit that Ms. Simmons so stated, but deny her professional competency to make such a statement, and deny the statement fully, fairly and accurately set forth the requirements of sedentary work since the carpal tunnel symptoms would preclude sedentary work which normally requires "good use of the hands and fingers for repetitive hand-finger actions." Social Security Ruling 83-10 (C.E. 1983).

29.    By letter dated April 5, 2007, Bake's counsel submitted new medical records and formally appealed the denial of her claim. (574-581). Counsel contended that Bake could not perform her occupation due to degenerative disc disease, lumbar and thoracic pain, carpal tunnel syndrome, and unidentified neurological problems. (574-581).

**Response:**    The first sentence is admitted. The second sentence is admitted except for the phrase "unidentified neurological problems," which is unsupported by the cited portion of the

record.  In addition, the summary of the contents of the appeal is neither full, fair, nor accurate as the appeal letter itself was seven pages long and was accompanied by a host of medical records.

30.     In a January 12, 2007 chart entry, Dr. Bergin ordered MRIs of Bake's cervical and thoracic spine. (611). The MRI of the cervical spine showed normal alignment and intact vertebral heights with normal marrow signal intensity. There was no abnormal enhancement. (631). The degenerative changes in the cervical spine were mild. There was no evidence of focal disc herniation, spinal stenosis or neural foraminal narrowing. (632).

**Response:**     Admit that this paragraph cites portions of the cervical MRI findings, but denied it fully, fairly and accurately reflects the radiologist's findings as set forth in the report. (632).

31.     The MRI of the thoracic spine showed normal alignment and intact vertebral heights with normal marrow signal intensity with the exception of endplate changes. Her thoracic spondylosis was moderate. There was no evidence of spinal stenosis or abnormal signal enhancement. (631-32). The MRI showed little change in the thoracic spine since the April 2006 MRI. (631, 345).

**Response:**     Admit that this paragraph cites portions of the thoracic MRI, but Bake denies it fully, fairly and accurately reflects the radiologist's findings as set forth in the report. (632).  Further, the statement is a complete mischaracterization since the MRI showed no improvement since the April 2006 MRI, and the radiologist noted moderate to severe disc degeneration at <u>all</u> levels of the thoracic spine, disc protrusions, and cord flattening.  (560) (emphasis added).

32.     Dr. Bergin agreed that the thoracic spine was unchanged since the MRI in April 2006. (610, 345). He nonetheless characterized the spine condition as disabling. (610).

**<u>Response:</u>**    Bake admits this paragraph reflects a portion of a chart note from Dr. Bergin on January 30, 2007, but Bake objects to the characterization of Dr. Bergin's opinion. His report stated, "The thoracic spine shows severe degenerative changes" and noted her condition had not improved since the April 2006 MRI. (610). In that same note, Dr. Bergin also stated Bake's cervical, thoracic, and lumbar spine are all problems, that she has low back pain radiating down her thigh, severe diskopathy, and that "all the discs in her spine have some degree of degeneration." *Id.*

33.    In an October 30, 2006 note included with the appeal, Dr. Arnold stated that Bake had good range of motion in the cervical spine, that she got up and down from a seated position without difficulty, and that she ambulated without difficulty. (624).

**<u>Response:</u>**    Bake admits this paragraph cites a portion of Dr. Arnold's chart note from that date, but denies it fully, fairly and accurately reflects the entirety of that note. Dr. Arnold also stated Bake had been hospitalized for abdominal pain and "was found to have an abdominal hernia that has gotten worse" and would require surgery. (622). She noted Bake had been using Ultracet for pain. *Id.* Dr. Arnold also noted trapezius muscle hypertrophy and multiple tender points in the muscles of Bake's cervical spine. *Id.*

34.    In a report dated January 17, 2007, Dr. Arnold stated that Bake had good grip strength in both hands. At the quadriceps, Bake's muscle strength was 5/5. (609). In a February 19, 2007 note, Dr. Arnold assessed that Bake had excellent bilateral grip strength and good strength levels at her biceps and triceps. There was no significant lateral epicondyle pain. (612). Dr. Arnold referred Bake to Craig S. Williams, MD for a surgical evaluation relative to her complaints of arm pain. (608).

**Response:**     The first two sentences are admitted.  Although the rest of the paragraph cites potions of Dr. Arnold's February 19, 2007 note, it fails to fully, fairly and accurately reflect the entire substance of that note, which confirms the diagnosis of bilateral carpal tunnel syndrome without significant relief from hand injections, as well as known hip arthritis and degenerative arthritis in the lumbar spine.  (608).

35.     In his February 28, 2007 report, Dr. Williams, reported that Bake had a normal range of motion in the wrists and digits bilaterally. He documented no atrophy or reduction in strength caused by carpal tunnel syndrome. (606). He stated that the testing Dr. Rechitsky conducted in October 2006 indicated mild carpal tunnel syndrome. (606 citing 484-86).

**Response:**     Bake admits this paragraph cites portions of Dr. Williams's February 28, 2007 report.  However, Bake objects to this report as the sole basis for Dr. Williams's opinion, as on a follow-up appointment on March 14, 2007 he noted Bake should be further evaluated. (240).  He also noted Bake had seen Dr. Rechitsky again.  *Id.*  Dr. Rechitsky wrote a letter to Dr. Williams on March 13, 2007 indicating that EMG/NCS testing on Bake showed some abnormalities, leading him to conclude she had progression of left carpal tunnel syndrome that required surgical intervention.  (257).

36.     To evaluate Bake's appeal, LINA first re-assessed the physical demands of Bake's occupation. On April 23, 2007, Sandra Schimizzi, MED, LPC, CRC, analyzed Bake's job and concluded it was properly classified as sedentary based on the Dictionary of Occupational Titles. (428-29).

**Response:**     Admit Ms. Schimizzi's report does so state.  Ms. Schimizzi's report also noted the job duties for this occupation under the Dictionary of Occupational Titles include

"coordinating activities, directing and managing," and "solicit[ing] new business" that would require traveling at both the local and national level. (428-29).

37.     LINA asked its associate medical director, John Mendez, MD, to analyze the medical records and report on whether Bake's condition prevented her from performing her prior occupation. (438). In a May 1, 2007 report, Dr. Mendez noted that Dr. Arnold reported that Bake had degenerative arthritis of the cervical and lumbar spine and pain along the anterior shin and iliotibial band. Dr. Arnold had not documented physical limitations. Dr. Bergin's notes documented degenerative changes in the thoracic spine but Bake had a normal gait, normal neurological exam, and no neurological deficits. (438).

**Response:**     The first sentence is admitted.  The rest of the paragraph summarizes Dr. Mendez's report, but Bake denies the statement since Dr. Mendez's conclusions were not based on an accurate and complete review of the medical evidence and because Dr. Mendez has no first hand clinical knowledge since he never examined Bake. Nor do Dr. Mendez's conclusory findings address Dr. Bergin's opinions as to the spinal degeneration.

38.     Dr. Mendez concluded that the records did not document "significant measured physical limitations, such as spinal range of motion by inclinometry and/or upper extremity strength deficits by manual muscle testing." (438).

**Response:**     Admit Dr. Mendez's report does so state; denies that the conclusion is of any relevance since there is no requirement in the applicable policy of insurance that the Bake submit "significant measured physical limitations."   Moreover, there is no means known to medical science to definitively measure pain.  American Medical Association, *Guides to the Evaluation of Permanent Impairment* 31 (6th ed. 2008) states that "[t]here is no objective way to quantify pain or its variable effects on the individual…."

16

39.    After Dr. Mendez prepared the report, Bake's counsel submitted additional records. (440, 445). Bake's physical therapists reported that Bake had good tolerance of the therapy and her condition was improving. (445-478).

**Response:**    The first sentence is admitted.  The second sentence is admitted to the extent it reflects a portion of the cited physical therapy records, but denied it reflects the entire substance of those records.  On August 25, 2006, the physical therapist noted that while Bake was progressing, she continued to have stiffness throughout the thoracic region, significant weakness in her upper extremities, and general deconditioning.  (391).  On October 13, 2006, she noted Bake had decreased shoulder range of motion and reduced upper extremity strength.  (390).  On January 1, 2007, she noted improvement but that Bake was still unable to ambulate stairs and was unable to lift pots and pans at home.  (389).

Furthermore, Bake's counsel submitted additional medical evidence to LINA on April 10, 2007 containing specified limitations as certified by Dr. Bergin.  In a Residual Functional Capacity Questionnaire (RFC) from Dr. Bergin dated March 30, 2007, which Defendant did not include in the claim file provided to Bake nor reference in its statement of facts, Dr. Bergin noted a fair to poor prognosis for Bake's diagnoses of cervical myelopathy and thoracic/lumbar spondylosis.  (Bergin RFC at 1).  He opined Bake's chronic pain would constantly interfere with her attention and concentration in a typical workday, and renders her unable to tolerate even a low-stress workplace.  (*Id.* at 2).  Specifically, he noted she could not sit or stand for more than 20 minutes at a time without taking a break, and that she had significant limitations with reaching, handling, and fingering.  (*Id.* at 4).  Overall, he concluded Bake is unable to hold a job due to her condition.

40.     In a May 10, 2007 letter, Dr. Bergin stated that Bake's ulnar pain was secondary to her cervical spine, and that her cervical spine did not preclude her from working. He contended that pain in the thoracic spine, and to a lesser extent in the lumbar spine, limited her from performing her job. (443). Dr. Bergin stated that Bake had had severe thoracic spine pain for several years. (444). While Dr. Bergin contended that the thoracic condition was disabling, he stated it did not justify surgery. (444, 103).

**Response:**     The first sentence is denied because Dr. Bergin stated that while Bake's "cervical spine alone would not necessarily warrant disability," it was still a "contributing factor" to her inability to work along with thoracic degenerative disk disease and lumbar degenerative disk disease. (443-44). The second and third sentences are admitted. The fourth sentence is denied because Dr. Bergin stated "She has severe degenerative disks with marked kyphosis in her thoracic spine and it is my opinion *this will likely need surgical intervention at some point*." (443) (emphasis added.)

41.     On May 15, 2007, Dr. Mendez analyzed the records that had been received since his earlier analysis. In his report, Dr. Mendez stated that the records did not document significant physical limitations relative to the cervical, thoracic or lumbosacral spine. (437).

**Response:**     Bake admits Dr. Mendez's record so states, but his conclusion is completely contrary to the objective radiology reports and clinical findings (See Response to No. 40) despite the fact that Dr. Mendez has no contrary clinical findings since he never examined Bake.

42.     On May 25, 2007, Appeal Claim Manager Medha Bharadwaj denied the appeal based on Dr. Mendez's analysis. (434-36). Bharadwaj noted that the medical evidence did not

document significant measured physical limitations that would preclude Bake from performing her prior occupation. (435).

**Response:**    The first sentence is admitted.  However, Bake denies the conclusion reached, denies that Ms. Bharadwaj has appropriate professional qualifications to render the determination reached, and because the conclusion is wholly contrary to the clinical evidence presented.

## V. Bake's Second Administrative Appeal

43.    On August 27, 2007, Bake's counsel submitted a second appeal. (105-110). He submitted a June 21, 2007 letter in which the Social Security Administration ("SSA") overturned its initial finding, on December 29, 2006, that Bake was not disabled or entitled to benefits. The SSA determined that Bake became disabled under SSA criteria on June 21, 2006. (114).

**Response:**    Admitted.

44.    Counsel also submitted a report (356-59) by Paul McFarlane, MD, who examined Bake on behalf of the SSA and found that: (a) Bake was alert, oriented, cooperative and appropriately dressed. (359). (b) She showed no evidence of muscle wasting or atrophy. Although she self-limited on strength tests and did not put forward maximal effort, she demonstrated motor strength of 4/5 in the upper and lower extremities. (358). (c) She moved from sitting to walking and ambulated with some hesitation and reports of thoracic spine pain. (357). (d) Her neurological exam, gait, and range of motion in all joints were normal. (358).

**Response:**    Bake denies that paragraph 44 fully, fairly, and accurately summarizes Dr. McFarlane's report, which was obviously deemed significant supporting evidence the Social Security Administration relied upon in awarding benefits.  Bake also submitted the entire Social Security claim file which compels a conclusion that Bake meets the disability standards

contained in the Social Security Act – unable to perform "any substantial gainful activity."  42 U.S.C. §423(d)(1)(A).  (114-317, 355-59, 581-90).

45.     To evaluate the appeal, LINA asked Avrom Simon, MD, MPH, CPE, to review Bake's medical records and analyze whether her conditions resulted in restrictions and limitations that would prevent her from performing her sedentary occupation. (100).

**Response:**     Admitted, but Bake denies the appropriate question was asked of Dr. Simon since more than the physical ability to perform a sedentary occupation was at issue – the policy required consideration of whether Bake could perform her own occupation.

46.     Dr. Simon prepared a detailed history of Bake's medical history and treatments, noting the following, among other things: (93-97).

  a.   In August 2003, Bake presented with neck and arm pain. EMG/NCV testing showed carpal tunnel syndrome. (citing 341-44). An MRI showed spondylosis of the cervical spine. (93 citing 352.)

  b.    In January 2005, an MRI of the thoracic and lumbar spine showed herniation of a disc in the lumbar vertebrae. (93 citing 349). The January 2005 report documented thoracic spondylosis. (350).

  c.   In January 2006, she underwent surgery for fusion of discs in the cervical spine. Her healing post-surgery was good. (93 citing 628-30).

  d.   After Bake presented with complaints of thoracic pain on April 25, 2006, an MRI showed moderate thoracic spondylosis and potential discitis (infection of the spine). (94 citing MRI report at 345). Biopsies ruled out discitis. (94 citing 278, 284-85).

  e.   On July 27, 2006, Dr. Bovis (the neurosurgeon) documented that Bake had a normal exam. (94 citing 496).

  f.   On August 22, 2006, Dr. Bergin noted that Bake's pain was managed, but he nonetheless opined that she was disabled. (94 citing 710).

  g.   Physical therapy notes on August 25, 2006 documented that Bake was able to do more around the house than she could at the onset of therapy. (94 citing 391).

h.    In December 2006, Dr. McFarlane assessed that Bake had no evidence of atrophy and that she made a sub-maximal effort in motor muscle testing. (94 citing 357-59).

i.    On December 18, 2006, Dr. Arnold found that Bake's neck pain had improved. She had no pain with forward flexion or extension of the lumbar spine. She had no pain with range of motion in the knees. (94 citing 252).

j.    On January 17, 2007, Dr. Arnold found that Bake had excellent grip strength bilaterally, "good strength at her biceps and triceps," and no lateral epicondylar tenderness. (94 citing 612).

k.    MRIs in January 2007 showed spondylosis, with no change since the May 2006 MRIs. (94 citing 631-32).

l.    On February 27, 2007, Bake told her physical therapists that she was performing increased activities of daily living ("ADL"), was using her arms overhead to get dishes out of the cabinet, and had returned to cooking. (95 citing 464).

m.    In a July 24, 2007 report, Howard S. Konowitz, MD, documented a normal manual muscle testing and a normal gait. (95 citing 112).

**Response:**    Admit this paragraph cites portions of Dr. Simon's report, but denies it reflects a "detailed history of Bake's medical history and treatments." Moreover, the report misrepresents and mischaracterizes the medical findings, which speak for themselves.

47.    Dr. Simon attempted to discuss Bake's conditions with Dr. Arnold and Dr. Bergin, but neither returned his calls. (95).

**Response:**    Admit the cited portion of Dr. Simon's report does so state; however, Bake is without sufficient knowledge as to whether Dr. Simon made attempts to call Bake's doctors or whether those calls were returned.

48.    Dr. Simon concluded that the objective medical data did not show restrictions or limitations that preclude Bake from performing her sedentary occupation. (95). In explaining this conclusion, Dr. Simon noted the following:

a.  Bake had had pain and spine problems since 2002. She had performed her sedentary occupation at Corus notwithstanding the conditions. The medical records did not reveal any change in her condition that precluded her from working as of June 2006.

b.  The medical reports made after her last day of work showed no "evidence of deconditioning or atrophy, as would be expected" in a patient engaging in less than sedentary activities. Rather than finding atrophy and deconditioning, her doctors documented that she had no atrophy and that she had normal levels of strength. The absence of deconditioning and atrophy demonstrated that Bake retained the capacity to perform sedentary work.

c.  Bake had a normal neurological exam and normal gait.

d.  Bake's ability to perform overhead tasks, cook, drive, go to doctor's appointments, and engage in physical therapy demonstrated that she was capable of performing sedentary work. (95-96).

**Response:**    Denied.  Dr. Simon's report never fully, fairly or accurately summarized the evidence and he reached the obviously ludicrous conclusion that getting up in the morning, showering and dressing were the equivalent of sedentary work.  (96).   Moreover, Dr. Simon never assessed whether Bake could perform her own occupation – his assessment was as to whether she could perform a sedentary occupation, which is not what the policy requires since it states that LINA evaluates disability based on whether the insured is capable of performing her regular occupation.  (373; Simon Depo. at 69-70).

49.    Dr. Simon concluded that the medical evidence did not establish restrictions or limitations that would preclude Bake from performing sedentary work, provided she was given an ergonomically correct work station and could take a 5 minute stretch break every hour. (96).

**Response:**    Bake admits Dr. Simon's report so states, but denies that Dr. Simon's conclusions about the medical evidence are full, fair, accurate or complete.  See Response to No. 49.

50.     On October 24, 2007, LINA's appeal claim analyst, Noemi Martinez-Landis, denied the appeal based on Dr. Simon's report. (90-92).

**Response:**     Admitted.


## PLAINTIFF'S 56.1 STATEMENT OF ADDITIONAL FACTS REQUIRING DENIAL OF SUMMARY JUDGMENT

1.      Janice Bake (DOB 5/xx/1949) was employed by Corus Bank for over 30 years, and as of June 2006 held the position of First Vice President-Operations Analyst.  (674, 721). Bake's position required her to manage the operations department, develop and implement operating systems, hire and manage competent staff, keep abreast of relevant legislation and technological advances, and work with various government agencies.  (722-23).  Although the occupation is classified as "sedentary" by the U.S. Government's Dictionary of Occupational Titles (DOT), it nonetheless requires he ability to coordinate complicated activities and manage people, prepare and analyze reports, sit and/or stand for long periods of time and work for varied hours/days, and travel on the local and national level.  (428-29, 718-22).

2.      In January 2006, Bake underwent a cervical diskectomy and fusion surgery due to chronic and severe back, neck, arm and shoulder pain related to cervical spondylosis and radiculopathy.  (154-58).  Although Bake initially attempted to return to work part-time after the surgery, she continued to experience symptoms of neck pain and numbness in her hands and arms.  (673, 703).  Furthermore, the progression of degenerative disc disease in her thoracic and lumbar spine, thoracic kyphosis, as well as rheumatoid arthritis and worsening carpal tunnel syndrome, all caused Bake significant pain which contributed to her ongoing inability to perform her job duties after June 21, 2006.  (484, 673, 700-10).

3.     Bake subsequently applied for LTD benefits under Defendant's policy, and submitted a report on September 13, 2006 describing how she experienced numbness and partial loss of feeling in both hands, fingers, and arms that limited her ability to use them. (673). She noted she cannot sit for long periods because her legs and feet tingle. (*Id.*) She reported pain and loss of balance caused her to drop things and prevent lifting and bending. (*Id.*) She noted that sitting causes muscle spasms to her shoulder and neck, and that she was only seldom able to use a computer due to neck pain and stiffness. (*Id.*)

4.     Bake's treating orthopedist, Dr. Christopher Bergin, submitted evidence supporting Bake's claims and certifying her disabling impairments. He filled out a medical request form from Defendant on September 12, 2006 certifying his opinion that Bake could not perform her job duties based upon cervical and thoracic problems. (700). He submitted medical records that indicated Bake experienced a return of cervical pain and numbness in her extremities a few months after surgery, as well as worsening thoracic back pain due to severe disc degeneration. (701-04). Dr. Bergin's records show Bake's pain became "more and more debilitating" and interfered with daily activities, and her worsening condition was confirmed by physical examination, x-rays, and a bone scan. (705-06). Further, an April 24, 2006 MRI showed moderate to severe disc degeneration at all levels of Bake's thoracic spine as well as disc protrusions and cord flattening, and Dr. Bergin noted thoracic spinal surgery should be considered. (560, 707-08). In an August 22, 2006 chart note, Dr. Bergin noted numbness in Bake's ulnar distributions, lumbar radiculopathy, thoracic problems, and reported that despite some pain management Bake remained "unable to perform her job duties and this may be permanent." (710).

5.    After Defendant's initial denial of her LTD benefits on November 8, 2006, Bake submitted an appeal and additional medical evidence in support of her claim. (422, 481-82, 574-81). She included reports from a neurologist, Dr. Igor Rechitsky, who diagnosed Bake with severe carpal tunnel syndrome after conducting nerve conduction studies on October 24, 2006. (484-86). On March 13, 2007, Dr. Rechitsky recommended surgical intervention for Bake's worsening left carpal tunnel syndrome. (257).

6.    Bake also submitted updated MRI results from January 15, 2007 that revealed "moderate thoracic spondylosis with multilevel disc protrusions again identified." (632). Dr. Bergin commented on January 30, 2007 that Bake's thoracic spine showed severe degenerative changes and that all the discs in her spine showed some degree of degeneration. (610). Dr. Bergin noted Bake had resultant low back pain radiating down her thigh and severe diskopathy. (*Id.*)

7.    On a March 30, 2007 Residual Functional Capacity Questionnaire (RFC) also submitted to Defendant, Dr. Bergin identified Bake's chronic pain due to cervical myelopathy and thoracic/lumbar spondylosis. (Bergin RFC at 1-2). Dr. Bergin opined that such pain would constantly interfere with Bake's attention and concentration in a typical workday, that she could not sit or stand for more than 20 minutes at a time without taking a break, and that she had significant limitations with reaching, handling, and fingering. (*Id.* at 1-2, 4).

8.    In a May 10, 2007 letter, Dr. Bergin clarified that while Bake's cervical spine alone would not necessarily preclude work, it was still a "contributing factor" to her inability to work along with thoracic degenerative disc disease, lumbar degenerative disc disease, and ulnar and median nerve distributions. (443-44). Dr. Bergin specifically noted Bake's thoracic condition would likely require surgical intervention and precluded even sedentary work. (*Id.*)

9.    Bake also underwent physical therapy for her condition, and submitted those notes to Defendant.  (389-421, 446-78).  On August 25, 2006, the physical therapist (PT) noted that while Bake had made some progress, she continued to have stiffness throughout her thoracic region, significant weakness in her upper extremities, and general deconditioning.  (391).  On October 13, 2006, the PT noted Bake had decreased shoulder range of motion and reduced upper extremity strength.  (390).  On January 1, 2007, she noted Bake was still unable to ambulate stairs and was unable to lift pots and pans.  (389).

10.    Despite this additional evidence, Defendant upheld its denial of Bake's claim on May 25, 2007.  (434-46).  Bake subsequently appealed a second time, and submitted evidence that the Social Security Administration awarded her disability benefits, finding her disabled since June 21, 2006.  (114).  An award of Social Security benefits indicates a finding that Bake was unable to engage in "any substantial gainful activity."  42 U.S.C. § 423(d)(1)(A) (Social Security definition of "disabled.")  Bake submitted the entire Social Security claim file to Defendant, which included an independent evaluation performed for the SSA by Dr. Paul McFarlane.  (358-59).  Dr. McFarlane examined Bake and noted multiple problems, including cervical pain associated with numbness and tingling and decreased range of motion in the cervical spine, thoracic spine pain, diminished range of motion of the lumbar spine, and balance problems, among other things.  (358-59).

11.    Despite the submission of the evidence described in the preceding paragraphs, Defendant again upheld its decision on October 24, 2007, relying on a report it requested from Dr. Avrom Simon, a non-practicing physician who reviewed Bake's file rather than examining her.  (90-96).  Dr. Simon's report indicated Bake had multiple medical problems, but he concluded there was no "objective" evidence that supports restrictions or limitations that would

prevent work.  (96).   He opined she could perform sedentary work, indicating this was demonstrated by "getting up in the morning, getting dressed and taking a shower."  (96).

12.     Bake's counsel deposed Dr. Simon on April 29, 2008.  Dr. Simon stated he had been employed for several years by Intracorp, a subsidiary corporation owned by Defendant and the company who referred him Bake's case.  (98-99; Simon Depo. at 5).  Dr. Simon stated he conducts approximately eight such file reviews a month for Intracorp, and never examines patients in connection with their benefit claims.  (Simon Depo. at 9, 24, 77).  Dr. Simon admitted he has engaged in no actual patient care or direct examination of patients for several years, but that his work consists entirely of conducting file reviews for insurers. (*Id.* at 9, 19-22).

13.     Dr. Simon, addressing the opinion in his report as to lack of "objective" evidence of Bake's limitations, admitted that no conclusive test exists to objectively determine exactly how much pain a person experiences.  (*Id.* at 17).  Dr. Simon conceded the most accurate way to determine pain limitations would be to perform a physical examination, take an in-person medical history, elicit specific pain responses, and test range of motion.  (96; Simon Depo. at 45-47, 59, 87-88).  Dr. Simon further acknowledged the independent examination of Bake by a Social Security physician showed markedly decreased range of motion in the lumbar and cervical spine.  (Simon Depo. At 55-56).

14.     Dr. Simon further admitted he never considered whether Bake's medical problems would prevent her from performing her job duties at Corus Bank.  (*Id.* at 69-70).  Rather, he only considered whether she could perform work in a "sedentary" capacity.  (96).  Dr. Simon also conceded that performing even a sedentary job would require more capability than is required by showering once a day, as he had noted in his report for Defendant.  (96; Simon

Depo. at 70-75). Dr. Simon further admitted he gave no consideration at all to Bake's ability to perform her significant non-exertional job requirements. (*Id.* at 67-68).

Respectfully Submitted,

/s/ Mark D. DeBofsky_____
One of the attorneys for the plaintiff

Mark D. DeBofsky
Daley, DeBofsky, & Bryant
55 West Monroe, Suite 2440
Chicago, Illinois 60603
(312) 372-5200
FAX (312) 372-2778

## CERTIFICATE OF SERVICE

The undersigned attorney hereby certifies that on July 11, 2008, he electronically filed the foregoing pleading with the Clerk of the Court using the CM/ECF filing system, which sent notice of such filing to all parties entitled to notice.

/s/ Mark D. DeBofsky_____
Mark D. DeBofsky

Mark D. DeBofsky
Daley, DeBofsky, & Bryant
55 West Monroe, Suite 2440
Chicago, Illinois 60603
(312) 372-5200
FAX (312) 372-2778