```
0001
 1              UNITED STATES DISTRICT COURT

 2              NORTHERN DISTRICT OF ILLINOIS

 3                   EASTERN DIVISION

 4   ----------------------------------------------------

 5   Janice Bake,

 6

 7          Plaintiff,

 8

 9      vs.                    Case Number 07 C 6600

10

11   Life Insurance Company of North America,

12

13          Defendant.

14   ----------------------------------------------------

15              Deposition of Avrom Simon

16

17              April 29, 2008

18

19                   -at-

20

21              Hinshaw & Culbertson

22              222 North LaSalle Street

23                   Suite 300

24              Chicago, Illinois

25
```

0002

```
 1                    APPEARANCES

 2              

 3              For the Plaintiff:

 4              Mark D. DeBofsky

 5            Daley, Debofsky & Bryant

 6             55 West Monroe Street

 7                  Suite 2440

 8            Chicago, IL 60603-5113

 9

10              For the Defendant:

11             Daniel Keenan Ryan

12            Hinshaw & Culbertson

13           222 North LaSalle Street

14                  Suite 300

15            Chicago, Illinois 60601

16

17       RECORDER:  Good morning.  The time is now

18  10:38 a.m.  Today is Tuesday, April 29th, 2008.  We are

19  at the law offices of Hinshaw & Culbertson, 222 North

20  LaSalle Street, Suite 300, Chicago, Illinois 60601.        0:00:12

21  This deposition is in the matter of Bake versus the

22  Life Insurance Company of North America, Case Number 07

23  C 6600.  It is the Northern District of Illinois,          0:00:20

24  Eastern Division.

25       Our witness today is Avrom Simon -- excuse me --
```

0003

```
 1   Dr. Avrom Simon.  Mr. Simon, my name is Shari Vietoris.
 2   I'm a notary public and an employee of Textnet Court        0:00:30
 3   Reporters.  Could you please raise your right hand for
 4   the oath?
 5                         (Witness sworn)
 6              RECORDER:  And could the attorneys please
 7   state their appearances for the record?
 8              MR. DeBOFSKY:  For the plaintiff, my name is
 9   Mark DeBofsky.
10              MR. RYAN:  Daniel Ryan appearing on behalf of
11   the defendant.
12              RECORDER:  Okay.  Thank you.  That's all the
13   required information.  You may proceed.
14                         EXAMINATION
15   BY MR. DeBOFSKY:
16      Q.   Dr. Simon, before we start, I just want to go
17   over a couple of ground rules for the deposition.  The      0:01:02
18   court reporter went over some of them before we
19   started.  Even though we're videotaping today, in order
20   to have a written record of the proceeding we need for
21   you to articulate your answers out loud, so yes, no, or
22   whatever the appropriate answer is.  Shaking your head      0:01:17
23   or shrugging your shoulders or even saying uh-uh could
24   be misinterpreted in the written record.  IS that
25   understood?
```

0004
1      A.    Yes.

2      Q.    Okay.  Also, again for the written record,        0:01:28

3  only one of us can talk at once time, so please give me

4  the courtesy of waiting for me to finish my answer

5  before -- my question before you start answering, and

6  likewise, I will give you the courtesy of letting you

7  finish your answer before I ask the next question.  Is    0:01:42

8  that understood?

9      A.    Yes.

10      Q.    And probably the most important rule of all

11  is that we can take a break at any time as you need it.

12  The only consideration that I ask is that if there is a

13  question pending that you answer the question before we   0:01:57

14  take a break.  Is that understood?

15      A.    Yes.

16      Q.    Are you represented by counsel in this

17  proceeding?

18      A.    Yes.

19      Q.    And that's Mr. Ryan?

20      A.    Correct.

21      Q.    Can you tell me approximately how many times

22  you've been?                                              0:02:14

23      A.    Deposed think possibly four or five.

24      Q.    When was the last time?

25      A.    Probably hasn't been for several years.

0005

1      Q.    Have any of the depositions that you've given

2   involved disability insurance claims?

3      A.    I -- I'm really not certain.  I know I did         0:02:39

4   one for a extensive injury on a -- on a workers' comp

5   case.  I know I did one for a personal injury case.  I

6   -- I'm really not certain if I ever did one on a

7   disability case.

8      Q.    Have you ever testified in court?              0:02:55

9      A.    No.

10      Q.    Have any of your depositions been either on

11   behalf of CIGNA or any CIGNA company?

12      A.    I believe one of them was in association with

13   Intracorp.                                             0:03:13

14      Q.    What's your understanding of the relationship

15   between Intracorp and CIGNA?

16      A.    CIGNA owns Intracorp.

17      Q.    And by whom are you currently employed?

18      A.    I am an independent consultant right now.      0:03:29

19      Q.    And does you -- does your business or

20   profession have a professional trade name?

21      A.    No.

22      Q.    I was able to locate a curriculum vita for

23   you, and I'm going to ask the court reporter to mark

24   that as your deposition Exhibit 1.  Showing you what

25   we've marked as your deposition Exhibit 1, can you      0:04:17

0006

1  identify this document for us?

2      A.    It appears to be a copy of a résumé that I

3  have been utilizing since early 2007.

4      Q.    Is Exhibit 1 current?

5      A.    I believe I've made just some very minor

6  changes in it, but it essentially would be accurate.        0:04:51

7      Q.    On Exhibit 1 you indicate that you were

8  employed by Intracorp from 1996 to 2000, is that

9  correct?

10     A.    Correct.

11     Q.    And your job duties for Intracorp are those

12 that were listed in Exhibit 1?

13     A.    Yes.   Actually, from 1996 to '97 I was I was     0:05:18

14 an independent contractor under them.   From '97 to June

15 of 2000 I was an employee with them.   And June of 2000

16 -- or July of 2000 they laid us off.   But the materials

17 that you see there do show the duties that I did for        0:05:41

18 them.

19     Q.    If you look at the first bullet point under

20 Intercorp physician advisor it says, "review and

21 negotiate short-term, long-term and workers'

22 compensation disability cases."   What involvement did

23 you have with respect to negotiation?                        0:05:54

24     A.    Negotiation in regards to what?

25     Q.    Well, you use the term review and negotiate.

0007

1      A.    Negotiate -- oh, yes.  I'm sorry.  That would

2   -- that was primarily work that I did with Ameritech

3   disability service center from '96 to '99.  Ameritech          0:06:12

4   had outsourced their short-term, long-term disability

5   and their work comp handling to Sedgewick.  Intercorp

6   sent me as a medical consultant to them and I would

7   review cases that were medically complex for the nurse

8   case managers and others who were handling the cases.          0:06:37

9   Often I was called upon to discuss a case with a

10  treating physician to get additional information.  And

11  occasionally obtained information that would support or

12  not support continued disability.

13      The negotiation would take the form of perhaps a          0:06:59

14  discussion with the doctor, and once the circumstances

15  of the patient's true work duty -- true work duties

16  were known or he was a -- he knew about accommodated

17  duties that were available for somebody, we would then

18  be able to negotiate a return to work.                         0:07:20

19      Q.    Did your work with Intracorp from 1996

20  through 2000 involve any patient care at all?

21      A.    Not with them.  No, I do not do patient care

22  for Intracorp.

23      Q.    Did your work with Intracorp involve any

24  examination of patients?                                       0:07:43

25      A.    No.

0008

1      Q.    Were you engaged in any direct patient care

2  between 1996 and 2000?

3      A.    Yes.

4      Q.    Can you tell me the nature of what that was?

5      A.    I was working at the Sherman Benefit Manager

6  Occupational Clinic.  And I had affiliation with them

7  from '96 -- it says there present.  That's not

8  accurate.  It was really like 2004, I believe.  And it          0:08:06

9  was also varying times per week or per month.

10     Q.    Tell me what your work at the Sherman Clinic

11  involved.

12     A.    That was just a regular occupational medicine

13  clinic, taking care of pre-employment physicals, drug          0:08:26

14  screens, urgent injury care, followup, assessments,

15  referral to specialists.  We did on-site visits to our

16  companies to assess their health environment, what we

17  could do to help them provide a safer workplace.  Did

18  case management with the representatives from the              0:08:49

19  companies.  And also, we had -- just when I started

20  they had developed a travel program, and sort of as a

21  sideline to have patients who were traveling

22  internationally would come to us for travel information

23  and destinations and such.                                    0:09:10

24     Q.    Did you carry a patient population while you

25  were working at Sherman?

0009

1      A.    Just the patients that would be in the

2    clinic.

3      Q.    If I were a consumer looking for medical

4    care, I couldn't have called you and become one of your

5    patients?

6      A.    Correct, correct.                                    0:09:33

7      Q.    You indicate that after your work at

8    Intracorp you worked for Zurich?

9      A.    Correct.

10     Q.    And I take it the job duties are those that

11   were listed --

12     A.    Yeah.

13     Q.    -- in your -- in Exhibit 1?

14     A.    Yes.

15     Q.    While you were working in Zurich did you

16   engage in any direct patient care?                           0:10:03

17     A.    Through about 2004.

18     Q.    And that was the work at Sherman?

19     A.    Yes.

20     Q.    Have you engaged in any patient care since

21   2004?

22     A.    No, not direct hands-on.

23     Q.    Have you performed any examinations of

24   patients since 2004?

25     A.    No.

0010

1    Q.   At any point in your career have you been    0:10:48

2  involved in direct patient care?

3    A.   From -- well, certainly at the medical school

4  and residency, and work through 2004.

5    Q.   Have you ever engaged in the private practice

6  of medicine?

7    A.   Me as like a sole provider or --

8    Q.   Or -- or -- or --

9    A.   -- independent --

10    Q.   -- with -- other -- with other physicians?    0:11:19

11    A.   No.  I've been affiliated with a hospital or

12  -- or group structure.

13    Q.   While you were working with Intracorp were

14  you given any training with respect to the assessment

15  of disability?

16    A.   In regard to?  Can you be a little bit more

17  specific?    0:11:56

18    Q.   Sure.  While you were employed by Intracorp

19  did you undergo any type of formal training program as

20  far as what standards or procedures or protocols

21  Intracorp would use with respect to the evaluation of

22  disability?

23    A.   Not specifically that, no.

24    Q.   Other than your medical school and residency    0:12:32

25  training, have you had any other type of formal

0011

1  training with respect to assessment of disability?

2      A.    I've taken a number of continuing education

3  courses in regard to use of the AMA guides to permanent

4  impairment and how such a -- the guide is to be used,        0:12:55

5  how patients are to be examined, what tools are

6  necessary, that allows one to arrive at a percent,

7  whole-person impairment of a person.  It also indicates

8  how to combine different body party impairments.  So

9  I've -- I've attended a number of sessions in regard to   0:13:13

10 that.  I believe I attended sessions from an

11 organization called American Association of Disability

12 Evaluating Physicians, AADEP, in the past who also

13 speak to that.  And I've read hundreds of such reports

14 that are obtained by carriers for typically workers'     0:13:32

15 comp, but to some lesser extent disability in terms of

16 evaluating a patient with disability and impairment.

17 So I've had pretty broad exposure to that.

18     Q.    Do you view the AMA guides as the gold        0:13:54

19 standard with respect to evaluation or assessment of

20 disability?

21     A.    The AMA guides gives impairment.  It's a

22 whole-person impairment, which is a number.  And

23 disability is a function of occupation.  So if I wanted

24 to do an assessment of a whole-person impairment, I     0:14:17

25 would go to the AMA guides.  But the AMA guides does

0012
1   not provide information about disability.  They do not

2   ever give any information that would say quantify an X

3   percent whole-person impairment with a person's ability

4   to work or be labeled disabled or anything like that.        0:14:40

5        Q.   Are there any texts or treatises that you

6   would rely on in assessment of disability?

7        A.   Nothing special that I can think of.  But my

8   assessment tends not to be making a evaluation on a

9   patient's being disabled.  It's usually a function of        0:15:05

10  what they can and cannot do.  The phrase "disabled" is

11  -- is looked at quite poorly.  That is undoubtedly

12  misused by many, many people all the time.

13       Q.   How would you define the term disability?

14       A.   Disability is a assessment of really a social

15  and a occupational type setting, so I -- and I don't

16  mean to make light of this particular example but I

17  have used this example repeatedly in -- in trying to

18  make that transition.  Rachael Barton, the violinist

19  who had her legs amputated at the knee, has significant       0:15:48

20  and severe impairment.  Nobody would question that.

21  However, when you look at what she must do, which is

22  basically sit and play a violin, she doesn't have a

23  high level of disability.  I know it sounds crude and        0:16:01

24  it sounds horrible, but in the world that I live in for

25  disability and impairment, that's the true definition.

0013
```
 1   So yes, she has high impairment but she's not disabled.    0:16:16

 2   She goes to work, etcetera.

 3       Q.   Would you consider the assessment of

 4   disability to be idiosyncratic?

 5           MR. DeBOFSKY:  Objection, vague and

 6   ambiguous.  If you understand the question, Doctor,    0:16:35

 7   feel free to answer.

 8       A.   Are -- are you saying does it like depend on

 9   who's who?  I -- I -- I don't make assessments about

10   disability.  I make assessments about functionality.

11   And what the complete record review that I do on a    0:16:53

12   given patient and analysis over time allows me to make

13   a -- an assessment as to whether or not the person is

14   able to perform their work as described or occasionally

15   just a sedentary job.

16       Q.   Are there any standards or guidelines that    0:17:20

17   you rely on in making such an assessment?

18       A.   I occasionally review the -- the formal job

19   description that has been provided to me -- sometimes

20   it's provided to me -- in regard to what the person

21   would have to do at their job.  Sometimes, however,

22   given the nuances of the claim or the time, it's a --

23   it's a so-called "any occ"* or any occupation, and it's

24   typically a sedentary category.  So -- so the only

25   thing I would ever really use potentially would be a
```

0014

1   job description of a -- of a sort of formal nature.

2       Q.   Is there any type of objective measure that        0:18:12

3   you rely on in performing a disability assessment or a

4   impairment assessment?

5       A.   I look at the whole picture of the patient's

6   presentation based on all the records that I have,

7   which can be -- go back many, many years, include the

8   writer's notes, surgical reports, lab tests, diagnostic     0:18:37

9   imaging tests, electric diagnostic testing, physical

10  therapy notes, surveillance footage which is often

11  provided, and ideally speak to the patient's treating

12  providers to get a full gestalt of the patient's

13  functional assessment before I provide any opinion.         0:18:58

14      Q.   What's the reason that you speak to the

15  patient's provider?

16      A.   Sometimes the notes are a little old and I'd

17  like to get some more information.  Sometimes they're

18  kind of -- you know, they -- they're hanging, it says

19  like, she'll come back and we'll see if we need -- I'm      0:19:16

20  not speaking of this case in general -- she'll come

21  back and we'll need to see how she's doing, but that's

22  like from January, and I need to find some more.

23      Oftentimes there's something that perhaps the

24  doctor doesn't want to put in writing in a formal           0:19:30

25  record and he wants to say something off the cuff to

0015
```
 1   me.

 2        Q.    Any other reasons that you would want to

 3   speak with the medical providers?

 4        A.    Again, just to get their -- clear up any

 5   confusion or just to get any updated information.        0:19:56

 6        Q.    In performing an assessment, what criteria

 7   are you looking for before you would determine that

 8   somebody is incapable of performing either their

 9   occupation or you used the term any occ, any

10   occupation?

11        A.    Well, again, I only make that assessment when   0:20:13

12   I'm told to.  So sometimes it's specifically a unique

13   job and sometimes it's a -- it's an any occ.  So again,

14   I don't make that distinction.  I'm told what to --

15   what to -- to look for.  So I'm sorry, can you repeat     0:20:30

16   the rest of that?

17        Q.    Sure.  In those occasions where you are asked

18   to make an assessment as far as whether somebody can

19   work at their job --

20        A.    Mm-hmm.

21        Q.    -- or at any occupation, what sort of

22   findings are you looking for in the records that will    0:20:45

23   convince you either that they are capable or not

24   capable?

25        A.    Well, it's not any one unique piece.  It
```

0016
```
 1   would be really, again, a whole picture of this
 2   patient.  And is this a patient who has had significant
 3   problems for a long time and then has been sort of        0:21:07
 4   struggling along and suddenly some event happens that
 5   -- that kind of pushes them over the side and they are
 6   now unable to work.  But that's just a for instance.
 7   But I don't know if there's any one specific thing.       0:21:24
 8   It's a conglomeration of the multiple notes that I
 9   receive from providers and the congruence between a
10   provider records subjectively and objectively and how
11   any of that fits the patient's imaging study results.
12   And the patient's data that they give about their
13   functional performance and my knowledge of the
14   workplace, and how those -- or how -- how that level of
15   performance would translate into successfully working
16   in the workplace.
17        Q.    In your opinion, can pain be disabling?
18              MR. RYAN:  Objection, vague and ambiguous.
19   Calls for speculation, improper hypothetical, lack of
20   foundation.  You can --
21              WITNESS:  Answer?
22              MR. RYAN:  If you're comfortable in answering
23   the question, Doctor, you can proceed.
24        A.    Patients often have severe subjective
25   complaints of which to which they say that they are
```

0017

    1   unable to work or function.  On occasion, if a patient

    2   were using a high degree of medication that was

    3   sedating or lead to somnolence or cognitive impairment,

    4   I might find that the use of such of medications would       0:23:09

    5   make their attendance in a work environment unsafe and

    6   consequently that they would be not able to work.  But

    7   it's not necessarily pain, per se.  It's really the

    8   reaction to the pain and, you know, how it treated.

    9        Q.   You're not aware of any test or method to

   10   measure the degree of pain that someone's experiencing,      0:23:46

   11   are you?

   12        A.   No, not at this time.

   13        Q.   Other than the example you gave of somebody

   14   who's taking medication that might have a sedative --

   15        A.   Mm-hmm.

   16        Q.   -- effect, what do you look for in the

   17   records with respect to either validating or

   18   invalidating complaints of pain medication?

   19        A.   Well, the first thing I would look at is what

   20   pain medication they're on.  How is this pain being

   21   handled.  And is it one of those instances where

   22   there's potentially sedating or cognitive interfering

   23   medications.  At the same time, if there was              0:24:27

   24   medications that are sedating and cognitive

   25   interfering, I'd want to see how the patient handles

0018

1   it.  So if I see in the record and the patient is on a

2   lot of those medications due to pain but has obviously

3   no functional impairment and drives an automobile and

4   is allowed to be alone in the house and her doctor has

5   done nothing to put restrictions on her activities, I          0:24:56

6   would find that to be a lesser assessment or -- or --

7   or I would find that to be one of many things that I

8   would look at in the file review but would -- I would

9   -- I would reserve my ultimate assessment on the

10  patient's functionality till the whole file was              0:25:14

11  reviewed.

12        Additionally, if they're complaining of pain and

13  they are highly functional, I would make note of that

14  because that would really not fit the typical

15  expectation of someone who's severely in pain.

16        Q.   When you use the term highly functional, what     0:25:40

17  do you mean by that?

18        A.   From the vast majority of cases we're looking

19  at sedentary activity, and sedentary activity means

20  performing ADLs and basically getting up in the

21  morning, getting dressed, taking a shower, not               0:25:59

22  necessarily in that order.  Getting up, taking a

23  shower, getting dressed, eating breakfast, and -- and

24  starting from that point.

25        Q.   Is it your opinion that the activities that

0019
```
 1  you've just described are the equivalent of having the
 2  capability of performing sedentary work?                    0:26:15
 3            MR. RYAN:  Objection, mischaracterization of
 4  his testimony.
 5       A.   It's a starting point for their functional
 6  status.  So in the highly unusual event where that's
 7  not there, although I -- I believe I have seen on rare
 8  occasion -- that would -- that would -- would jump out
 9  at me, but I -- I see that quite rarely.
10       Q.   It's rare in your experience that patients
11  cannot get up in the morning, shower and dress
12  themselves?
13       A.   Correct.  And that's typically described by   0:26:56
14  themselves in a patient questionnaire.  They readily
15  record that.
16       Q.   And since you were at Zurich you've indicated
17  that you're on your own --
18       A.   Correct.
19       Q.   -- at the present time?  And that's been
20  since sometime in 2007?
21       A.   Yes.
22       Q.   Tell me what the nature is of your current   0:27:26
23  professional activity.
24       A.   I work for a number of independent companies
25  -- Intracorp as well as several others -- and I do file
```

0020

```
 1  reviews, record reviews, utilization review work,

 2  things like that.  Consult with carriers on occasion.      0:27:54

 3      Q.   Is all of your current work on the side of

 4  either the insurers or respondents in workers'

 5  compensation claims?

 6      A.   It's -- well, none of the companies are

 7  actually insurers, so it's -- it's -- they're -- all

 8  the companies that I work are sort of a middleman to

 9  that process.  But it's -- for example, if it's a      0:28:13

10  utilization review request, it would be something that

11  say a doctor is requesting such-and-such a service for

12  a patient and the carrier is unable to authorize it, so

13  when appropriate you are -- it goes up for a      0:28:31

14  peer-to-peer discussion with the doctor.

15      Q.   Well, let's focus on disability --

16      A.   Mm-hmm.

17      Q.   -- evaluation.  What percentage of your

18  current professional activity is involved in reviewing

19  disability claim files?      0:28:48

20      A.   Twenty percent.

21      Q.   And how would you break down the remainder of

22  the 80 percent?

23      A.   Peer reviews for other organizations that are

24  typically not disability, most work comp, occasionally

25  some PI, and the rest is all utilization review.
```

0021

```
 1        Q.    Is the work comp work that you do solely on      0:29:20

 2   the side of respondents?

 3        A.    Well, if you're asking is it -- are they

 4   things that -- I'm not sure -- it -- it's -- it -- the

 5   UR work has not usually gotten to a point of -- of --

 6   of -- of a -- a legal thing.  It's simply a doctor

 7   requesting something from the carrier that the carrier

 8   then, again, escalates up for a peer-to-peer

 9   discussion.

10        Q.    But you're working in that context with the     0:29:53

11   carrier to decide whether the particular treatment is

12   --

13        A.    Is medically appropriate.

14        Q.    -- approved or not?

15        A.    Mm-hmm.  Yes.

16        Q.    And with respect to your work in personal

17   injury claims?

18        A.    That's very little, but I would say yes, it's

19   --

20        Q.    Respondent or defendant? -- Not -- not the      0:30:15

21   side bringing the claim.

22        A.    It's usually the side that is responding to

23   say a demand.

24        Q.    Okay.

25        A.    So is that defense?
```

0022

```
1         Q.    That would be defense.  And with respect to

2    the work that you do for disability claims, do you work

3    with any organizations other than Intracorp?              0:30:38

4         A.    Not at present.

5         Q.    Do you work directly with any other insurance

6    carriers?

7         A.    No.

8         Q.    Do you have any type of a contract with

9    Intracorp?

10        A.    I have a physician -- a standard physician

11   advisor contract with Intracorp.

12        Q.    Does the physician advisor contract contain     0:31:15

13   any types of protocols or guidelines with respect to

14   evaluations?

15        A.    It might.  I -- I don't recall specifically

16   what it says.  And I've done this for -- enough in the

17   past.  I -- I -- if it is there, I -- I didn't read it

18   and I felt whatever I was doing was -- was meeting        0:31:48

19   their needs.

20        Q.    Do you have a copy of that contract?

21        A.    You know, I -- I looked for it and I -- at

22   the present time I can't find it.  I'm sure it's

23   somewhere but I -- I don't have it.  I'm sorry.

24        Q.    How are you compensated by Intracorp?  Are      0:32:04

25   you compensated by the file or by time?
```

0023

```
 1        A.    By time.

 2        Q.    At what rate?

 3        A.    A hundred and twenty-five dollars an hour.

 4        Q.    Are you given any guidelines or limitations

 5   with respect to how much time you're allowed to spend

 6   on a file?

 7        A.    No.  It's basically a sort of free rein of --      0:32:27

 8   of -- of time.  People honestly submit for their -- for

 9   their billing.

10        Q.    Does Intracorp provide you with a form or a

11   template as far as how they expect their reports to be

12   written?

13        A.    Only in the most like crudest, so it should

14   have a -- you know, like -- you know, like a little            0:32:57

15   letterhead with, you know, name and contact

16   information.  I think it's supposed to say "To Whom it

17   May Concern" or something like that.  And then it says

18   at the end, "this was based on record review only, no          0:33:13

19   exam."  But those are not parts that I pay atten -- pay

20   attention to.  They -- those get added on by some

21   clerical person.

22        Q.    Would you be able to estimate approximately

23   how many files you've reviewed for Intracorp in the

24   last month?

25        A.    Eight.
```

0024

1    Q.    And how about in the last year?                    0:33:46

2    A.    I really didn't start with them doing these

3    reviews until I think summertime.  I would guess -- and

4    -- and -- and really this is just quite a guess.  I

5    couldn't say --

6         MR. RYAN:  Well, Doctor, I don't think either    0:34:10

7    Mr. DeBofsky or I would like you to guess or to

8    speculate.  If you have --

9         WITNESS:  I really couldn't say with any

10   comfort.

11   Q.    Would about eight files a month be an

12   average?

13   A.    Possibly.

14   Q.    Throughout your career have you ever been       0:34:48

15   asked to -- strike that.  Throughout your career has

16   any individual patient asked -- or a patient's attorney

17   asked you to write a report certifying that patient is

18   disabled?

19   A.    No.

20   Q.    With respect to the work that you do, do you    0:35:18

21   limit yourself to particular kinds of cases like

22   musculoskeletal, any particular body system or type?

23   A.    No.  They send me cases that a typical

24   request has been for an occupational medicine physician

25   reviewer, or often I have had a special request for me  0:35:43

0025

1  to do the review by some case manager.  But they do

2  fall into a wide variety of medical conditions.

3       Q.   What type of cases would trigger a special

4  request that you review the file?

5       A.   Some specific request by a -- by a case

6  manager who must have admired one of my prior reports.      0:36:17

7       Q.   Would it be a particular case manager?

8       A.   I haven't really paid attention.

9       Q.   Are there areas that you feel more

10 comfortable with and areas that you feel less

11 comfortable with in doing a review?

12      A.   I feel pretty comfortable across the board;      0:36:43

13 however, if I do get a case that is clearly out of my

14 realm I will indicate that it's not something that I am

15 comfortable doing, that it should be assessed by

16 someone else.

17      Q.   What type of case would you consider to be

18 outside of your realm?                                      0:36:57

19      A.   Some -- well, for certain psychiatric

20 conditions and I -- some more obscure orthopedic things

21 I occasionally don't like to do.  I know peds doesn't

22 typically work, but I never go near anything pediatric.

23 Some oncology but not too often.                            0:37:31

24      Q.   You said that you're asked to review cases

25 where they're received from an occupational med --         0:37:47

0026
```
 1   medicine reviewer?

 2        A.    Correct.

 3        Q.    And what do you consider to be within the

 4   scope of that?

 5        A.    Well, board certified occupational medicine,     0:37:55

 6   residency trained, so -- like myself.

 7        Q.    Well, what areas of medicine?  What body

 8   systems or --

 9        A.    Well, occupational medicine basically

10   combines every body system.  It's a specialty dedicated

11   to preventing, identifying and treating work-related

12   injuries and illnesses.  So we need to know the impact     0:38:15

13   of a disease condition on the body and how that puts

14   that person or coworkers at risk in the workplace.  So

15   we also have the very unique history of having actually

16   both done our residency training in an industrial

17   environment and should have ongoing visits to             0:38:42

18   industrial settings to -- to know exactly what goes on

19   at a given company.  Patients come in and say, I use a

20   punch press or, I use this machine, or whatever, and I

21   would say the vast majority of physicians have no idea     0:39:03

22   what that means.  They have no idea what physical

23   demands that would have on that patient.  They would

24   have no idea what kind of accommodated duty or how that

25   job could be done differently.  And the overall world
```

0027
```
 1   of work is something that is unique to occ med-trained      0:39:18

 2   physicians.

 3        Consequently, when these are reviews for, again,

 4   functional assessment, i.e., could this person work or

 5   do their job, occ med people have a unique background

 6   that allows them to speak from an informed position.      0:39:43

 7        Q.   With respect to your -- your educational

 8   background --

 9        A.   Mm-hmm.

10        Q.   -- had you undergone any kind of formal legal

11   training?

12        A.   No.

13        Q.   Have you undergone any formal vocational

14   training?

15        A.   No.

16        Q.   Do you ever work hand in hand with a

17   vocational rehabilitation specialist?      0:40:19

18        A.   Not at the present.  I did do some assessment

19   of a transferrable skills analysis in the past.  I will

20   occasionally get such materials as part of a packet of

21   -- of clinicals that are given to me for a file review,

22   but I don't usually take it and go with it.      0:40:41

23        Q.   I notice that you're licensed in several

24   states?

25        A.   Correct.
```

0028

```
 1      Q.   Which states are you currently licensed in?

 2      A.    Illinois, Texas, New Yor -- no.  Sorry.

 3   Illinois, Texas, Florida, California, Connecticut.  New

 4   York is inactive and I let Oklahoma lapse.              0:41:06

 5      Q.   Do you physically do any work in any states

 6   other than Illinois?

 7      A.   No.  The reason for that was my prior

 8   employment required a medical director to be licensed

 9   in those states, and hence I got licensed.  But as a --

10   I do work that stems from Texas and California and       0:41:29

11   Florida where, in addition to a medical director being

12   licensed in those -- in those states they'd like the

13   reviewer to be licensed, so indirectly I'm doing work

14   in those states.

15      Q.   Have you ever had any administrative

16   proceedings brought against you with respect to any

17   licensure?                                               0:42:01

18      A.   No.

19      Q.   I take it there haven't been any criminal

20   proceedings --

21      A.   No.

22      Q.   -- brought again you?  Have you ever been a

23   party to a civil suit, either a plaintiff or a

24   defendant?

25      A.   No.
```

0029

```
 1       Q.    Are you currently board certified in any

 2  particular medical specialty?

 3       A.    I am board certified in occupational        0:42:28

 4  medicine, which is via the American Board of

 5  Preventative Medicine.

 6       Q.    And when did you become certified in

 7  occupational medicine?

 8       A.    I believe January '94.

 9       Q.    Did you have to complete a specialized

10  residency in that field?

11       A.    Yes.

12       Q.    Did you have to be tested in that field?    0:42:50

13       A.    Well, tested via the board exam.

14       Q.    Did you pass the board exam on the first try?

15       A.    Yes, I did.

16       Q.    Congratulations.  Have you had to take any

17  recertification exams --

18       A.    Our --

19       Q.    -- since '94?

20       A.    Our board does not require that.  I did,     0:43:13

21  however, take and pass the American Board of Quality

22  Assurance and Utilization Review Physicians

23  certification exam.

24       Q.    Who administers that?

25       A.    The American Board of Quality Assurance and
```

0030
1    Utilization Review Physicians.

2        Q.    When did you take that exam?

3        A.    I think it was like '98.

4        Q.    And what did you have to do to qualify to sit

5    for that exam?

6        A.    Demonstrate that you were engaged in that

7    type of work, quality assurance and utilization review,

8    and then take certain continuing education courses and

9    then take their exam.

10       Q.    Are you a member of the American College of        0:44:00

11   Occupational and Environmentalists?

12       A.    No, not at this time.

13       Q.    Have you been in the past?

14       A.    Yes, I have.

15       Q.    Why are you no longer a member of that

16   organization?

17       A.    It was expensive and my work was moving away       0:44:15

18   from the world that they embody.

19       Q.    Do you belong to the American Medical

20   Association?

21       A.    No.

22       Q.    Have you ever?

23       A.    No.

24       Q.    Exhibit 1 indicates that you are a member of

25   the American College of Physician Executives?

0031

1      A.    Correct.

2      Q.    Is that current?

3      A.    Yes.

4      Q.    And what is that organization?                 0:44:40

5      A.    It's a organization that used to be called

6   the American College of Medical Directors.  It's an

7   organization that was created for physicians who were

8   moving out of traditional clinic roles into more

9   executive management and leadership roles.  And they    0:44:55

10  provide ongoing education, support and resources for

11  physicians in those situations.

12      Q.    And I saw that you also have membership in

13  the American College of Managed Care Physicians?

14      A.    Mm-hmm.

15      Q.    Is that current?

16      A.    I believe so.

17      Q.    And what is the scope of that college?          0:45:25

18      A.    Just I think very -- a nice little group of

19  -- of physicians who've had managed care medicine

20  responsibilities and leadership roles, and they provide

21  some -- some continuing education classes and things     0:45:38

22  like that.

23      Q.    Are there any other organizations that you

24  belong to?

25      A.    No.

0032

1     Q.   Are you familiar with any code of ethics that

2  has been issued by the American Medical Association?

3     A.   Nothing specific.

4     Q.   Are there any specific code of or guidelines

5  that you feel are applicable to your work?

6     A.   I do an honest review of the record and

7  report it thusly, and would not hesitate to indicate

8  something that I thought might not be well received if

9  -- but, you know, I just do an honest review of the    0:46:47

10  data and report appropriately.  What happens -- I would

11  say 85, 90 percent of the time I submit a case I never

12  hear about it again.

13     Q.   You use the term well received.  What do you

14  mean by that?

15     A.   Can -- can you back up and tell me what I    0:47:09

16  just said?

17     Q.   Sure.

18         MR. DeBOFSKY:  Could we have that answer --

19         RECORDER:  Mm-hmm.

20         MR. DeBOFSKY:  -- read back, please?

21              (Record replayed)

22     A.   I meant that somebody didn't like what it

23  said.  Someone didn't like the conclusions.

24     Q.   Do you consider that there is any type of    0:48:40

25  physician-patient relationship between you and the

0033
1   patient whose file you might be reviewing?

2            MR. RYAN:  I'll object insofar as it calls

3   for a legal conclusion.  He's not here as an attorney

4   or an expert witness to opine about physician-patient

5   relationships and what constitutes such a relationship,    0:49:02

6   whether it be in the medical malpractice field or

7   whatever.  I'll leave it to you to decide whether to

8   answer.

9        A.   But I -- I don't think there is any

10  physician-patient relationship.

11       Q.   Do you consider your role in reviewing files    0:49:34

12  to be equivalent of that to a medical director?

13       A.   As medical director of different places I

14  reviewed many records.

15       Q.   Are there any guidelines that you're aware of

16  with respect to the ethics of serving as a medical

17  director?

18       A.   I would imagine -- I don't -- I'm not sure,    0:50:13

19  but I would imagine ACPE, American College of Physician

20  Executives, might have a code of conduct or something

21  like that.

22       Q.   You made some mention earlier about the

23  Guides to the Evaluation of Permanent Impairment --    0:50:35

24       A.   Mm-hmm.

25       Q.   -- that's published by the American Medical

0034
```
 1   Association?
 2        A.    Mm-hmm.
 3        Q.    Have you familiarized yourself yet with the
 4   6th edition?
 5        A.    In small part.  It's not something that I do
 6   on a regular basis.
 7        Q.    Do you consider that the -- the 6th edition
 8   to the AMA guides is authoritative?
 9        A.    You know, I really don't know enough about it
10   so I'm going to have to defer any further comment about      0:51:02
11   that.
12        Q.    What about the 5th edition?
13        A.    I think they took the information that they
14   had and tried to enhance the book to make it more
15   user-friendly for the preponderance of non-doctors who
16   are doing impairment ratings or the preponderance of         0:51:24
17   people who are called upon to do impairment ratings and
18   do so poorly.  The point of the book is that it has
19   interrelate -- inter-rater reliability and it never          0:51:35
20   has, and so they tried to take what they could and have
21   it just as easy to use as some orthopedic surgeon who
22   does it all the time versus some family practice doctor
23   who does it never since everybody seems to like the
24   idea of a absolute number that they can ascribe to a         0:51:58
25   patient's condition, whether or not it's preexisting or
```

0035
1    culpable or whatever, so --

2         Q.    In looking at your Exhibit 1, I notice that

3    you've done some teaching in the past.  Have you done

4    any teaching since 2000?                                    0:52:25

5         A.    Oh, constantly.  At Zurich I was teaching

6    everybody all the time.  Formal, informal.  I taught an

7    academic -- an anatomy class to the associates

8    internship program.  I routinely would travel

9    throughout the country visiting our case managers and     0:52:43

10   attorneys and senior adjusters reviewing the

11   utilization review process, the peer review process and

12   basically what my medical department did and what they

13   could do to help them.  And also we do sort of

14   impromptu discussions with the utilization review

15   nurses in Schaumburg and then some telephonic reviews     0:52:56

16   that we would do with our case managers who were

17   nationally on kind of lunch-and-learn sessions.  So

18   I've done a lot of teaching.

19        Q.    What about in medical school, have you taught

20   at a medical school since 2000?

21        A.    No.

22        Q.    Have you taught at any continuing medical

23   education programs since the year 2000?

24        A.    I did give a speech at a CME conference a

25   number of times under presentations that -- you can see

0036

1   at the very end of the --

2       Q.   The most recent one would have been in 2000,

3   is that correct?

4       A.   2005 it looks like --

5       Q.   I'm sorry --

6       A.   -- at the bottom.  Yeah.

7       Q.   -- 2005.  Have you had any professional

8   publications?                                              0:54:08

9       A.   No.

10      Q.   Do you own any stock or stock options in the

11  CIGNA Corporation?

12      A.   I do not believe so.

13      Q.   Do you currently maintain malpractice

14  insurance?

15      A.   I have errors and omissions policies coverage

16  provided for me from the various places that I do work.

17      Q.   Does the errors and omissions coverage

18  involve any type of patient care or patient

19  examination?

20      A.   I doubt it.  I believe that's what makes it

21  that kind of coverage.

22          MR. RYAN:  Excuse me, Mark.  We're coming up

23  on an hour.  Two things.  One, can we take a break.

24  And two --

25          MR. DeBOFSKY:  Why don't we go off the --

0037
```
 1              MR. RYAN:  -- are we going to at some point
 2   move to the plaintiff in this case?
 3              RECORDER:  Off the record at 11:33.
 4                   (Off the record)
 5              RECORDER:  We're back on the record at 11:46.
 6       Q.   Doctor, in the reviews that you've done for      0:55:58
 7   Intracorp since you started reviewing files for them
 8   you said I believe last summer --
 9       A.   I've done reviews a number -- for many years,
10   but I started up again in -- last summer, mm-hmm.
11       Q.   Are you able to break down the percentages as   0:56:18
12   far as how many times you found that the claimant was
13   disabled versus the number of times that you found that
14   they were not disabled?
15       A.   You know, it would be very hard to come to
16   that conclusion.  There -- there are a lot of reviews.
17   I kind of do them and -- and send them away, so I don't  0:56:36
18   really retain a lot of that information.  So it would
19   be really hard to -- to -- to -- to come up with a
20   guess.
21       Q.   Would you say that the majority of the
22   reviews that you've done in the past year for Intracorp  0:56:55
23   have resulted in a conclusion that the patient was
24   capable?
25              MR. RYAN:  Objection, asked and answered.
```

0038
1   The question's already been asked and answered.   Go

2   ahead.

3               WITNESS:   IS that --

4               MR. RYAN:   You can answer.

5        A.   It's hard to say.

6        Q.   In the reviews that you've done for Intracorp

7   since last summer, have you been asked to give an          0:57:25

8   opinion orally before you prepared a report?

9        A.   No.

10       Q.   Have you ever been asked by Intracorp not to

11  write a report on a file that you've reviewed?

12       A.   No.

13       Q.   Do you know how you were selected to review

14  Janice Bake's file?

15       A.   No, I do not.

16       Q.   I'm going to show you a document we have          0:58:01

17  marked as your deposition Exhibit 2 for identification.

18  Showing you what we've marked as your deposition

19  Exhibit 2.  Is this a document that you've seen before?

20       A.   Yes.

21       Q.   And in what context did you see this

22  document?

23       A.   It's the standard like face sheet as it were    0:58:33

24  with -- that's given to me with reviews that come out

25  of that office.

0039

1    Q.    Do you know Jo Jacobson?

2    A.    No, I do not.

3    Q.    Do you know Noemi Landis?

4    A.    No.

5    Q.    As best as you can recall, is this the first

6    time that you've reviewed a file that was assigned by    0:58:53

7    Nurse Jacobson or Ms. Landis?

8    A.    No.  I think I probably have done others from

9    her.

10    Q.    From which one?

11    A.    From Jo.

12    Q.    Were you familiar with Nurse Jacobson from

13    when you worked for Intracorp in the 1990s?

14    A.    I don't remember the name.

15    Q.    And what, if anything, accompanied Exhibit 2?

16    A.    Records.

17    Q.    Were they itemized in any way?

18    A.    Probably put in a chronological order.

19    Q.    Did you ever make a list for yourself of all

20    the records that you received from Intracorp?    0:59:51

21    A.    No.

22    Q.    Were only medical records sent to you?

23    A.    There probably was the patient's self

24    questionnaire about her functional status.  There

25    probably were some legal communications, communications

0040
```
 1   from the carrier to the claimant.  I would think        1:00:23

 2   physical therapy notes, whatever.

 3        Q.   Have you retained a copy of the documents

 4   that were sent to you?

 5        A.   No.  Whenever I complete a case email the

 6   report and I overnight back the records.

 7        Q.   So do you have a independent recollection as

 8   far as what was -- what records were provided to you or   1:00:48

 9   are you just speculating?

10        A.   Well, for absolute certainty I would have to

11   speculate, but I did recently review records from

12   Counsel, from --

13        Q.   When did you do that?

14        A.   One day last week and last evening and this

15   morning.                                                  1:01:11

16        Q.   How much time have you spent with Counsel?

17        A.   Couple hours.  Maybe an hour, hour and a half

18   yesterday?

19        Q.   How about last week?

20        A.   No.

21        Q.   How much time?

22        A.   Nothing.

23        Q.   You just reviewed records on your own?

24        A.   Mm-hmm.

25        Q.   Is that yes?
```

0041
```
 1      A.    Yes.  I'm sorry.                         1:01:34

 2      Q.    And how much time did you spend with Counsel

 3 today?

 4      A.    Twenty minutes.

 5      Q.    With respect to the records that you reviewed

 6 starting last week, would that have been the entire

 7 claim file?

 8      A.    It was whatever Counsel had, they gave it to   1:01:55

 9 me.

10      Q.    You have no way of independently know whether

11 what Counsel showed you was identical to what you

12 received from Intracorp or CIGNA or LINA, do you?

13      A.    Specifically on a one-by-one basis, no.  But

14 the gist of the records and reviewing it against my

15 report looked like it was the materials that had been

16 given to me.

17      Q.    With respect to the materials that you          1:02:29

18 received, were you furnished with a copy of the policy

19 under which Ms. Bake was insured?

20      A.    I don't recall.

21      Q.    Were you furnished with the text of the

22 definition of disability under the pol -- in the policy

23 under which Ms. Bake was insured?

24      A.    I don't recall.

25      Q.    Were you furnished with a copy of Ms. Bake's    1:02:50
```

0042
1    position description provided by her employer?

2        A.    Yes.

3        Q.    Did you maintain any record of the amount of

4    time that you spent reviewing Ms. Bake's file?

5        A.    If I did it's long gone because it's been

6    paid for, and I sort of cross them off a list and make        1:03:18

7    it go away.

8        Q.    How much compensation did you receive with

9    respect to this claim?

10        A.    I don't know.  Would have been  125 times

11    however many hours were submitted.

12        Q.    How much time did you spend on this case?

13        A.    I couldn't say with any certainty.  Several        1:03:36

14    hours.

15        Q.    More than ten?

16        A.    I doubt it.

17        Q.    Was the size of Ms. Bake's file typical of

18    the file size that you normally receive from Intracorp?

19              MR. RYAN:  Objection as to the use of the

20    word "typical" as vague and ambiguous.  Lack of        1:03:57

21    foundation.

22        A.    It was actually quite large.

23        Q.    Can you give me an estimate as to the normal

24    amount of time you spend reviewing a file?

25              MR. RYAN:  Objection as to the use of the        1:04:12

0043

 1    word "normal."  Vague and ambiguous, lack of

 2    foundation.

 3        A.    You know, each case is unique.  And, you

 4    know, I don't set a time limit.  They don't set a time

 5    limit.  It's really whatever I need to do to go through      1:04:27

 6    the records.  Sometimes a file that's -- looks very

 7    small can be very dense and have, you know, a lot of

 8    information that needs to be reviewed.  Sometimes other

 9    big files don't.  And then contacting physicians and

10    talking to them can take some time.  So it's really         1:04:47

11    hard to say.

12        Q.    With respect to Ms. Bake's file, were there

13    any reports of any independent medical examinations

14    contained in the file?

15        A.    I believe there was a -- well, there was I

16    think two reviews for Social Security, I believe.

17        Q.    To the best of your knowledge o recollection,      1:05:15

18    did CIGNA or the Life Insurance Company of North

19    America perform an independent examination of Ms. Bake?

20        A.    There had been records from their internal

21    review and investigation.

22        Q.    That -- that was a review, correct, not an

23    examination?

24        A.    Correct.

25        Q.    In your opinion, would there be an advantage

0044

```
 1   to having someone like you review Ms. Bake's file
 2   versus having her examined by an independent physician?
 3        A.    The issue that was given to me from CIGNA was
 4   to answer specific questions, and their intent was to
 5   have me review medical records and given an opinion as
 6   to whether or not the restrictions and limitations were
 7   supported were not in the documentation provided for
 8   review from the dates in question.
 9        I don't know what a doctor who would be examining      1:06:20
10   the patient on a one-time deal would be able to get a
11   picture of the patient's true functionality.  And I do
12   not know if it was a doctor who doesn't have a keen
13   understanding of the workplace and what a sedentary job    1:06:38
14   is would be adequately qualified to make an assessment
15   of her ability to work.
16        Q.    When you were working at the -- the clinic at
17   Sherman Hospital --
18        A.    Mm-hmm.
19        Q.    -- did you conduct examinations of patients      1:07:17
20   for the purpose of determining whether they were
21   capable of working at their occupation?
22        A.    Yes.
23        Q.    And on those occasions when you conducted
24   those examinations were you given records to review in
25   advance?
```

0045

```
 1        A.    Sometimes.  Typically a job description.  Or
 2   typically I would be familiar with the employer and --        1:07:39
 3   and the tasks that the person would have to perform.
 4        Q.    And if a patient came to you for an
 5   examination, what's the first thing that you would do        1:07:54
 6   with the patient?
 7        A.    Take a history.
 8        Q.    What is the purpose of that?
 9        A.    To obtain information about their current
10   condition, prior conditions, what treatment they've
11   had, what makes them better, what makes them worse.  So
12   -- and basically what brings you here today.                  1:08:10
13        Q.    Was there anything that you did with respect
14   to Ms. Bake that was comparable to taking a history?
15        A.    Reviewing all of her records.
16        Q.    Was there anything that would have impeded
17   you from calling Ms. Bake and taking a history over the
18   telephone?
19        A.    That's not the process.                           1:08:29
20        Q.    Is there a reason why it couldn't be part of
21   the process?
22        A.    I don't know, but that's just now how it's
23   done, I believe.  I don't know whose rule it is.  It's
24   just not the process.
25        Q.    When you've examined patients independently
```

0046

```
 1  and taken a history, what is the value of taking the        1:08:52

 2  history?

 3       A.   Well, it can tell us what, you know, they're

 4  thinking is wrong with them, and again, what treatments

 5  they've had, as well as then it correlates to other

 6  histories that have been taken on the patient.  In a         1:09:14

 7  case of say some sort of dementia, you can watch from

 8  one time to another to see if the patient's story stays

 9  the same.  Oftentimes a story will be prefaced by

10  somebody who will write "poor historian," leading one

11  to conclude that that which they tell you is -- needs        1:09:28

12  to be either investigated further or, you know, taken

13  sort of with a grain of salt in someone, but sometimes

14  that depends on the overall presenting symptoms.

15       Q.   In performing independent examinations did

16  you ever perform any independent examination of a           1:09:52

17  patient without taking a history?

18       A.   No.

19       Q.   After taking the history, what would be the

20  next thing that you would do in conducting an

21  independent exam?

22       A.   Examine the patient.

23       Q.   And what's the purpose of that?

24       A.   To see objective abnormalities or objective        1:10:11

25  normalities.  Normal findings.  Document what is and is
```

0047
1   not present.

2       Q.   Is one of the purposes of the examination to

3   elicit responses?

4       A.   What sort of responses?

5       Q.   Well, if you press in a certain point and the    1:10:37

6   patient describes exquisite pain, is that something

7   that you gain from an examination?

8       A.   Potentially.

9       Q.   And an examination gives the doctor an

10  opportunity to measure loss of range of motion, doesn't

11  it?

12      A.   Yes.

13      Q.   And gives the doctor an opportunity to    1:10:59

14  measure either loss or preservation of strength?

15      A.   Yes.

16      Q.   And it also gives the doctor an opportunity

17  to measure reflexes?

18      A.   Correct.

19      Q.   And it also gives the doctor an opportunity

20  to measure neurological responses?

21      A.   Mm-hmm, yes.

22      Q.   In the setting of the Sherman clinic did you    1:11:44

23  ever render diagnoses or prescribe treatment without

24  examining a patient?

25      A.   Not typically, although I can imagine there

0048

1    probably was some times when some finding would be

2    overt that would not require close followup.

3        Q.    But that would be a typical wouldn't it?        1:12:08

4        A.    In general, yes.

5        Q.    I saw in the report that you prepared that

6    you attempted to reach two of Ms. Bake's treating

7    physicians --

8        A.    Mm-hmm.

9        Q.    -- is that correct?

10       A.    Yes.

11       Q.    And one was Dr. Erin Arnold?

12       A.    Yes.

13       Q.    Do you know who Dr. Arnold is?                   1:12:30

14       A.    She's a rheumatologist who was taking care of

15   the patient.

16       Q.    And what were your efforts to attempt to        1:12:37

17   reach her?

18       A.    Whatever is recorded on my report.

19       Q.    Did you advise her office the purpose of --

20       A.    Yes.

21       Q.    -- your call?  Did you provide Dr. Arnold's

22   office with an authorization from the patient that

23   would have allowed you to speak?                          1:12:53

24       A.    With hero.  That's typically -- that --

25   they've received all of those things.  I believe

0049

1   occasionally they throw one in from Intracorp or it's

2   just part of the pile.  Every once in a while somebody

3   does throw that out.  And I think I occasionally fax it

4   to them.  But this was month ago.  I don't remember          1:13:13

5   what.  I don't -- I haven't had that request for a

6   while, so I did not offer it.  It's part of the process

7   the patient signed it, and when the patient embarks

8   under treatment with anybody they sign a form             1:13:28

9   indicating that they authorize the case to be discussed

10  with the insurance company and anyone the insurance

11  company wants.

12       Q.   Do you know if Dr. Arnold had such an

13  authorization on file?

14       A.   I would imagine that she would -- you know,    1:13:40

15  she doesn't practice appropriately.

16       Q.   Have you ever had occasion where a doctor

17  you've attempted to contact has advised that they will

18  not speak to you without an authorization?

19       A.   Yes.

20       Q.   Does that happen frequently?

21       A.   No.

22       Q.   Would it also be correct to say that you did    1:13:59

23  not provide an authorization to Dr. Bergin?

24       A.   Yes.

25       Q.   Do you know Dr. Bergin?

0050

```
 1        A.    No.

 2        Q.    Do you know what kind physician or doctor

 3   Kevin Bergin is?

 4        A.    Kevin?  It says Christopher Bergin here.  Is        1:14:13

 5   --

 6        Q.    Or Christopher.  I'm sorry.

 7        A.    An orthopedic surgeon, if I recall.

 8        Q.    Did you indicate the purpose of your call to

 9   Dr. Begin's office?

10        A.    I typically say who I am, where I'm calling

11   from, that I need to speak to the doctor about the        1:14:25

12   patient's disability status.

13        Q.    What --

14        A.    And they usually say, do you want medical

15   records?  He's not here.  I'll give you his nurse.

16   He's in the other clinic.  He won't be back till three

17   weeks from now, etcetera.  It's not a particularly

18   productive step.  But I do it because it's important to        1:14:38

19   see what other information they want to share with me

20   or if there is no other information.

21        Q.    Okay.  And Intracorp specifically requested

22   you to speak to the treating physicians?

23        A.    CIGNA or whoever these -- requests it, yes.        1:14:51

24        Q.    That's contained in Exhibit 2, correct?

25        A.    Mm-hmm.
```

0051

1      Q.    What time of day did you call Dr. Arnold's

2  office?

3      A.    It's in my report I think, but it would have

4  been probably morning.  And we make two calls.  And now

5  they -- for some reason they wanted us to make three          1:15:17

6  calls.

7      Q.    What time of day did you call Dr. Bergin's

8  office?

9      A.    I'm guessing morning.  I would do that

10  typically to allow them the maximum day to -- the

11  maximum time of day to call me back.

12      Q.    Did you convey to either doctor that it was

13  important they call you back?

14      A.    I guess so.

15      Q.    Do you work off a script when you call the

16  doctors offices?

17      A.    I've -- well versed in what to say.

18      Q.    Did you make any effort to elicit the

19  assistance of anyone from CIGNA in speaking to the          1:15:59

20  treating physicians?

21      A.    No.

22      Q.    Did you make any effort to elicit the

23  patient's assistance in speaking to the treating

24  physicians?

25      A.    I never speak to patients.

0052

1      Q.    Were there any communications from my office

2   in the documents that you reviewed?

3      A.    Yes.

4      Q.    Did you make any effort to contact my office      1:16:17

5   to assist you in speaking with the treating physicians?

6      A.    No.

7            MR. DeBOFSKY:   Let's mark this as Exhibit 3,

8   please.

9      Q.    Okay.   Showing you what's been marked as your

10   Exhibit 3 for identification.   Is this a copy of the

11   report that you prepared regarding Janice Bake?

12      A.    Yes.

13      Q.    Is this the only report that you prepared?

14      A.    Yes.

15      Q.    Were there any drafts of the report?

16      A.    No.

17      Q.    Did you ever sign a copy of your report?

18      A.    I don't believe so.   If it did get one it

19   would have been electronically affixed.      1:17:15

20      Q.    On the first page at the top of the page

21   there's an indication of "File No. facility's 58980"?

22      A.    Correct.

23      Q.    Can you tell me what that signifies?

24      A.    It's an Intracorp code.

25      Q.    In preparing Exhibit 3, did you write the

0053

1  report yourself or did you dictate it?                    1:17:47

2       A.   I typed it myself.

3       Q.   Did anyone else participate in editing your

4  report?

5       A.   No.

6       Q.   And how did you get the report to Intracorp?

7       A.   It was emailed back.  And then the whole

8  record file was then sent back in an overnight package.   1:18:27

9       Q.   Did you include a copy of your report when

10  you sent the records back?

11      A.   I doubt it, because usually they get it --

12  sometimes they request a hard copy signed, but I don't

13  believe that they did this time.

14      Q.   After you transmitted your report to

15  Intracorp did anyone from Intracorp or CIGNA or LINA     1:18:51

16  call you regarding the report?

17      A.   No.

18      Q.   Did you receive any written communication

19  from anyone at Intracorp, CIGNA or Life Insurance

20  Company of North America regarding the report?

21      A.   No.

22      Q.   Any email?                                       1:19:07

23      A.   No.

24      Q.   If you look at the first page of Exhibit 3

25  three paragraphs from the bottom there's a two-sentence

0054
1    paragraph that starts, "Ms. Bake was see."

2        A.    Mm-hmm.

3        Q.    Do you see that?

4        A.    Yes.

5        Q.    The second paragraph -- the second sentence

6    in that paragraph states, "an inconsistent" --          1:19:34

7    inconsistent being in quotes --

8        A.    Mm-hmm.

9        Q.    -- "neurological exam was documented."

10       A.    Mm-hmm.

11       Q.    Whose report was that?

12       A.    I don't remember who the doctor was.  It

13   could be -- I don't know.  I don't think it was someone

14   who she saw again.  I don't specifically recall, no.     1:19:56

15       Q.    What was the date of that report?

16       A.    I don't recall either, but it would have been

17   between January 17th, '05 and 5/05, because there was

18   reference to activities before then.

19       Q.    Okay.  As you go through this report you are

20   writing in chronological --

21       A.    Correct.

22       Q.    -- order?

23       A.    Correct.

24       Q.    Okay.  On the second page you make reference   1:20:39

25   to a report from a Dr. McFarlane?

0055

1      A.    Yes.

2      Q.    I assume you had a copy of Dr. McFarlane's

3   report?

4      A.    Correct.

5      Q.    Showing you what we've marked as your

6   deposition Exhibit 4 for identification.  Is this a

7   copy of Dr. McFarlane's report that you reviewed?        1:21:09

8      A.    I believe so, yes.

9      Q.    And is it your understanding that Dr.

10  McFarlane examined Ms. Bake independently on behalf of

11  the Social Security Administration?

12     A.    Correct.

13     Q.    Does Dr. McFarlane offer any opinion that Ms.

14  Bake was exaggerating her symptoms?                       1:21:37

15     A.    He notes that the patient, under motor

16  strength, was limited by effort and perceived pain.  He

17  records essentially what the patient told him, or he

18  likely had reviewed other records before.

19     Q.    Dr. McFarlane measured range of motion of the   1:22:20

20  lumbar and cervical spine, didn't he?

21     A.    He did.  Well, he records it.

22     Q.    And he indicates a measurement of lumbar

23  flexion of 40 degrees, is that correct?

24     A.    Yes.

25     Q.    And normal is 60?

0056

1      A.    Okay.  I don't have those tables memorized.      1:22:38

2      Q.    And he indicates lumbar -- lumbar extension

3 of 10 degrees, is that correct?

4      A.    Correct.

5      Q.    And normal there would be about 25 degrees?

6      A.    Conceivably, yes.

7      Q.    And he indicates lateral flexion of the

8 lumbar spine of 5 degrees?

9      A.    Yes.

10      Q.    And normal would be about 25 degree?      1:22:59

11      A.    Probably 20, but I don't remember

12 specifically.

13      Q.    Okay.  And cervical flexion was listed at 20

14 degrees?

15      A.    I'm not sure where you see that.

16      Q.    Under the heading "back" after the lumbar,

17 same paragraph.

18      A.    Oh, okay.  Yes, uh-huh.      1:23:23

19      Q.    Okay.  And normal would be about 60 degrees?

20      A.    Yes.

21      Q.    And lum -- cervical extension he listed at 10

22 degrees?

23      A.    Yes.

24      Q.    And normal there would be about 75 degrees,

25 wouldn't it?

0057

```
 1       A.    I highly doubt it.

 2       Q.    What degree --

 3       A.    I --

 4       Q.    -- would you --

 5       A.    I don't know, but 75 sounds a bit -- a bit        1:23:41

 6    much.

 7       Q.    It would be a significant decline from

 8    normal?

 9       A.    It could be yes.  Mm-hmm.

10       Q.    These --

11       A.    What --

12       Q.    -- findings as far as range of motion would

13    be objective findings, wouldn't they?

14       A.    Well, in part.  He doesn't indicate --

15    they're objective in the sense that he tells the

16    patient to do it and she does it, and he sees it, so

17    it's observable and it's recordable.  It's certainly

18    subject to self-limitation, which he doesn't clear

19    indicate she did or didn't.  It's also subject to a

20    passive range of motion versus an active range of

21    motion.  He doesn't indicate that he encouraged the

22    patient with her range of motion.  He doesn't indicate

23    that he helped her with her range of motion, i.e., like

24    flexsion beyond 40 degrees was accompanied by screams

25    of agony or something like that.
```

0058

1         So what we basically have here, near as I can tell

2   because it's a little incomplete, is the patient's            1:24:37

3   self-limited range of motion measures of the neck and

4   low back as recorded.

5         Q.   Your report references throughout the term

6   "objective data"?

7         A.   Mm-hmm.

8         Q.   What do you mean by that term, "objective

9   data"?

10        A.   Something that theoretically -- well,            1:25:06

11  something that's measurable, observable, reproducible,

12  like a lab test, an MRI finding and so on.  But

13  objective data in and of itself doesn't necessarily

14  imply pathology.  One likes to see it, as it helps the

15  entire picture, but it doesn't -- doesn't necessarily     1:25:30

16  fit.  I can -- I can give you an example unrelated to

17  this case if you'd like.

18        Q.   That's not necessary.  In the heading of the

19  report under "Back" --

20        A.   Yes.

21        Q.   -- Dr. McFarlane says, "the claimant has

22  kyphosis?                                                  1:25:51

23        A.   Correct.

24        Q.   What does that term mean?

25        A.   Hunchback.

0059

1    Q.    And what is that attributable to?

2    A.    Poor posture often.

3    Q.    Is it also attributable to degeneration of

4    the spine?

5    A.    It could be.

6    Q.    Do you know whether the insurance policy        1:26:25

7    under which Ms. Bake was insured requires objective

8    data?

9    A.    I know nothing about the terms of her policy.

10    Q.    Were you instructed by Intracorp or by CIGNA

11    or the Life Insurance Company of North America to only

12    identify what findings were objectively supported?      1:26:48

13    A.    No.   I don't get instructions other than what

14    you saw there on the top sheet.

15    Q.    Would you consider pain elicited on

16    examination to be an objective finding?

17    A.    It would depend on the circumstances.

18    Q.    Would you consider balance or gait

19    disturbance observed on examination to constitute an     1:27:09

20    objective finding?

21    A.    In isolation perhaps, but again,

22    circumstances would need to come into play.

23    Q.    Would you consider Ms. Bake's condition of

24    diabetes to be significant with respect to your

25    findings?

0060

1       A.    I look at the whole thing together to come to      1:27:38

2    an assessment.  It's -- I don't really rank the

3    different features of her condition, but that probably

4    was not a key element of her condition.

5       Q.    Did you note Dr. Wocinsky's findings of the      1:27:57

6    diabetic polyneuropathy?

7       A.    Possibly.  There were so many

8    electrodiagnostic testings that didn't fit what the

9    patient had, and we do not judge electrodiagnostic

10   testing of severe, moderate and mild as -- as          1:28:15

11   clinically significant.  So I do not know if that --

12   I'm sure I saw it.  I'm sure I took it into account.

13   But its impact on the patient's functional ability and

14   her ability to work within restrictions and

15   limitations, I don't know what -- how that was part of

16   the picture.

17      Q.    What is a positive Tinel sign?

18      A.    That's when you hit the -- over the median

19   nerve with a little hammer here, and if the pain

20   radiates into the median nerve distribution it's

21   typically positive for carpal tunnel.  And you also can

22   do it up at the elbow and it's a similar thing for an    1:28:59

23   ulnar nerve disease.

24      Q.    Ms. Bake's clinical findings were consistent

25   with carpal tunnel syndrome, weren't they?

0061

```
 1      A.    She had complaints of that nature, yes.

 2      Q.    And that was in both wrists?

 3      A.    I believe one wrist was treated surgically,     1:29:20

 4   and another time the hand surgeon did not think

 5   presentation even though the EMG findings did show

 6   carpal tunnel syndrome and possible worsening carpal

 7   tunnel syndrome, he did not think surgery was

 8   appropriate.

 9      Q.    Was Ms. Bake also diagnosed with rheumatoid

10   arthritis?                                               1:29:45

11      A.    That word has been bandied out throughout the

12   course of this case.  I don't believe it.  I hear it

13   once, then it's throw out again another time.  She was

14   seen at least ten or 15 times by Dr. Erin Arnold, a

15   rheumatologist, who at no point makes reference to the  1:29:59

16   patient having rheumatoid arthritis.  She at no point

17   has any findings that would be attributable to advanced

18   or even basic rheumatoid arthritis.  She has no cardiac

19   or any intra-abdominal organ pathology that often        1:30:11

20   accompanies rheumatoid arthritis.  I saw no lab test

21   that got that confirmation.  So where it came from I

22   don't know, but the data does not support that she has

23   rheumatoid arthritis, or if she did she has the most

24   benign case, but I don't believe it anyway.              1:30:26

25      Q.    Are you familiar with the term comorbidity?
```

0062
1       A.   Yes.

2       Q.   And what is your understanding of the meaning

3   of that term?

4       A.   An additional disease process that a patient

5   has at the same time as another.

6       Q.   And are there comorbid diseases that Ms. Bake      1:30:46

7   has according to the records?

8       A.   Yes.   She has multiple medical issues.

9       Q.   Did you take the comorbidity into

10  consideration in assessing Ms. Bake?

11      A.   I'm sure I did, as, again, I look at anything

12  before coming to any kind of assessment, but a lot of      1:31:09

13  these comorbidities are really play no role in making

14  an assessment as to whether or not she can work in

15  those time periods.   So -- so, you know, whether or not

16  it plays a role or not is -- is something I would look     1:31:26

17  into and assess.

18      Q.   Showing you what we've marked as your

19  deposition Exhibit 5 for identification.

20      A.   Mm-hmm.

21      Q.   Is this a document that you reviewed?

22      A.   Again, I can't say for certain but perhaps.       1:32:00

23      Q.   Do you agree that an appropriate diagnosis in

24  this case is cervical radiculopathy?

25      A.   I would have to review the rest of the data

0063

```
 1   that was surrounding her case of September '06, but she

 2   did have cervical radiculopathy in January of '06 that

 3   led to her surgery, so possibly.

 4       Q.   And you say that Dr. Bergin also indicates

 5   myelopathy?

 6       A.   Yes.

 7       Q.   And --

 8       A.   I'm not sure what he supports that with.

 9       Q.   What is the meaning of that term?

10       A.   Myelopathy means like cord compression, so

11   you can have diffuse pathology up and down both arms

12   and legs, weakness maybe, sensory changes, impaired

13   reflexes.  I don't believe Dr. Bergin wrote this form

14   because an orthopedic surgeon would know that the word    1:32:55

15   thoracic is spelled with an S -- a C, rather, and not

16   an S.  So I don't believe -- and it also looks like, if

17   I may, feminine handwriting.  So all in all, I don't

18   think he filled that form out other than signed it,       1:33:08

19       Q.   You never --

20       A.   I never have, no, I'm sorry.

21       Q.   -- reviewed this form, is that --

22       A.   Oh, no, never.

23       Q.   Do you disagree with the diagnosis of

24   thoracic kyphosis?

25       A.   Probably not, no.
```

0064

1    Q.    And if you look down on the form, Exhibit 5

2    --

3    A.    Mm-hmm.

4    Q.    -- it asks, "what are the specific additional

5    factors impacting your return to work, if any?"

6    A.    Mm-hmm.

7    Q.    And the first item listed is "not able to

8    look forward greater than half an hour at a time."

9    A.    Mm-hmm.

10    Q.    Do you disagree with that restriction?

11    A.    I don't know where he assessed that

12    restriction since the patient was indicating that she

13    was driving her cars up to 20 miles at a time.  I'm

14    guessing that she would have had to look forward or not

15    look forward more than a half hour at a time, and yet

16    he was having her drive and didn't take away her          1:34:01

17    driver's license.  So I'm finding that odd.

18        And the materials that are -- the things that are

19    recorded there would be, in my opinion, something that

20    the doctor wrote down based on the fact of what the --

21    what the patient told him about that she could or could   1:34:27

22    not do.  He has nothing in his notes, he has nothing --

23    he has done no formal testing.  There's no real data to

24    indicate that he ever even reviewed her job

25    description.  Certainly never explored light-duty         1:34:44

0065

1    options or accommodated-duty options.  So where he came

2    up with those things are not clear.

3         Q.   Is there anything in the policy that you know

4    of that requires formal testing?

5         A.   No.  But if he's going to say something I

6    think it should have something, you know, supporting

7    it, and that doesn't.                                        1:35:04

8         Q.   Is there anything in the policy that you're

9    aware of that would disallow the claim if the claimant

10   were capable of performing with an accommodation?

11        A.   Say that again, please.

12        Q.   Let me rephrase that.  Are -- are you aware

13   of any provision in Ms. Bake's insurance policy that       1:35:19

14   would disqualify her from receiving benefits if there

15   were some type of a workplace accommodation?

16        A.   I don't know anything unique to her policy.

17   However, I do know that on occasion policies might

18   either not provide benefits or would reduce benefits in    1:35:40

19   those circumstances.

20        Q.   Did you come to a conclusion that Ms. Bake

21   would be able to work with a workplace accommodation?

22        A.   My assessment was that the patient could

23   perform sedentary duty, I believe, or whatever it was

24   recorded here in my note.  I noted that there were         1:35:59

25   ongoing medical problems that required medical care and

0066

1  attention.  However, the issues when taken in a whole,

2  or independently, but of course as a whole, did not

3  support that this patient was totally disabled from all    1:36:19

4  work tasks.  Rather, she is able to engage in sedentary

5  work.

6       Q.  Was it your conclusion that Ms. Bake could

7  perform her job at DeForest Bank without the need for

8  any accommodations?

9       A.  I don't -- given the duration of time, I

10 don't think specifically that was asked of me,

11 specifically uniquely to her job duties.  Rather, it

12 was a function of could she perform sedentary work.  I

13 guess by extension, since the job was described as

14 sedentary, it would be then yes, she could do the job

15 at the bank.                                                1:37:00

16      Q.  When you use the term "sedentary," what do

17 you mean by that?

18      A.  Well, I don't have my formal job description

19 as the Department of Labor asserts, but sedentary jobs

20 are essentially someone who basically sits at a desk

21 all day long, gets up, you know, every hour to stretch,    1:37:19

22 go to the bathroom, get coffee, basically sits with a

23 headset, does computer work, talks on the phone, jots

24 things down.  That's -- that's a classic presentation

25 of what I think of in terms of sedentary work.  Could      1:37:39

0067
1   there be other jobs that are just as sedentary?  Yes.

2   I just think of that in my mind when I see sedentary

3   job.

4        Q.   In performing this assessment were you only

5   looking at the exertional requirements of the sedentary

6   job?

7        A.   Well, whatever physical demands there might          1:37:58

8   be for lifting, standing, bending, whatever the typical

9   critieria that -- that I looked at in that assessment,

10  yes.

11       Q.   Did you consider any other requirement of Ms.

12  Bake's job that would be non-exertional?

13       A.   What do you mean?                                     1:38:21

14       Q.   The ability to maintain concentration and

15  attention.

16       A.   Well, the -- yes, I would say that came into

17  account too.

18       Q.   Where is it documented?

19       A.   I would say in the overall assessment that

20  the patient could do sedentary work.

21       Q.   What about the ability to --                          1:38:44

22       A.   The fact that the patient --

23       Q.   -- review complex financial information?

24            MR. RYAN:  Excuse me.  Let him finish.

25       A.   The patient is engaging in dog training

0068
```
 1  activities.  She drives.  She stays alone in her home.
 2  She cooks and cleans.  To me, that does not show          1:38:59
 3  cognitive impairment, whether or not there is a use of
 4  narcotics or other drugs that would cause sedation or
 5  cognitive impairment or confusion.  There's nothing in
 6  the file that indicates that the patient is impaired as
 7  a result of that.                                         1:39:15
 8       Again, had she been, the doctor would have
 9  restricted her driving and likely restricted her
10  ability to stay alone in the house, which he doesn't
11  do.  So given that, we find nothing that would impair
12  her in those ways.                                        1:39:38
13       Q.   What kind of dog training was she doing?
14       A.   I have no idea.  In a note from I believe
15  9/06 or 5/06 -- I think it was -- I forget which -- she
16  indicates under avocational activities that she was
17  doing something about training guide dogs, which is
18  very desirable but still I would think quite active and  1:39:54
19  quite something that would require one to have their
20  wits about them.  And in May of '06 in physical therapy
21  she notes that she had a little twinge of extra pain
22  due to the fact that the dog cage had some problem and
23  she had to go clean it out.  So those to me were         1:40:09
24  suggestive of increased activities.
25            MR. DeBOFSKY:  Can you mark this as 6,
```

0069
1  please?

2      A.   Oh, yes.

3      Q.   If you look at Exhibit 6, is this a document

4  that you were furnished with?

5      A.   I believe so, yes.                        1:40:47

6      Q.   And if you go down right before number 8 on

7  the page --

8      A.   Mm-hmm.

9      Q.   -- it appears that she was training with a

10  dog to be a service dog for her.  Isn't that how you

11  would read it?

12      A.   I have no idea.

13      Q.   You never asked anybody, did you?

14      A.   No.  How would you define the activity      1:41:14

15  involved in training a service dog?

16      Q.   More --

17      A.   To me that was something that would be

18  required effort and physical demand and cognitive

19  competence.

20      Q.   Cognitive competence equivalent to working as

21  the manager of a?  Cognitive competence equivalent to

22  working as the manager of a bank?

23      A.   I wasn't worried about her working as a

24  manager of a bank.  That was not what was asked of me.

25      Q.   You were merely assessing whether she could

0070
```
 1   work in a sedentary job?                                 1:41:40

 2        A.    That is correct.  And I believe I've said

 3   that before.

 4        Q.    On Page 4 of your report -- let's see -- you

 5   state, "the patient is engaging in sedentary work

 6   merely by getting up in the morning, getting dressed

 7   and taking a shower."                                    1:42:03

 8        A.    That's correct.  And then driving 20 or so

 9   miles --

10        Q.    Well, that --

11        A.    -- going to her exercise program, cooking,

12   cleaning, shopping, doing laundry, reading, watching

13   TV, and other two to four hours a day five days a week.

14   I'm not sure what other is.  I'm guessing it's the      1:42:21

15   dogs.  If she felt that it would be misinterpreted, she

16   should have expounded further.

17        Q.    Well --

18        A.    She then goes for a walk one to two, three

19   times a day depending on pain in muscles and joint      1:42:34

20   disability.

21        Q.    With respect to your report at page 4 --

22        A.    Mm-hmm.

23        Q.    -- you don't say any of those statements

24   after the sentence that says, "the patient is engaging

25   in sedentary work merely by getting up in the morning,
```

0071

1   getting dressed and taking a shower." Is that your          1:42:51

2   opinion, that that's the equivalent of sedentary work?

3       A.    Where are we looking?

4       Q.    Three paragraphs from the bottom, the last

5   sentence.

6       A.    It's a conglomeration of the -- everything

7   which precedes it.

8       Q.    Okay.  Can you cite me to any text that          1:43:11

9   would corroborate that opinion that getting up in the

10  morning, getting dressed and taking a shower is the

11  equivalent to engaging in sedentary work?

12      A.    I could give you a form that the DO --

13  Department of Labor looks at as a description of job        1:43:29

14  demands.  And that statement, again, indicates it is to

15  be taken into account everything that precedes it.  She

16  engages in an ongoing, active exercise program.  She

17  was improving.  She was going to work overhead getting

18  dishes out of the cabinet and able to return to cooking    1:43:50

19  with lighter, smaller pots and pans.  She was to join a

20  gym and etcetera.

21      Q.    With respect to this Department of Labor

22  form, would you be able to provide me with a copy of

23  that after this deposition?

24      A.    Possibly.                                          1:44:08

25      Q.    I would like to have a copy of that.

0072

1      A.    It indicates eight hours a day seated, no

2   more than ten pounds lifting on an occasional basis.

3   Nobody wanted her to operate machinery or work in a

4   factory.

5      Q.    In performing your evaluation were you aware

6   that Ms. Bake had been awarded Social Security        1:44:29

7   disability?

8      A.    I doubt it.

9      Q.    Would that have any significance to you?

10     A.    Zero.

11     Q.    Why is that?

12     A.    Their -- I have no idea how they do their

13  assessments.  I've -- I've heard back and forth that

14  either you need to be dead to get Social Security.  Now   1:44:47

15  I've heard it's moved back that you can get it just

16  looking the wrong way, and back and forth.  I don't

17  know what the current assessment is.  I have seen SSDI

18  reports on other patients who I have disagreed with, so   1:44:54

19  it wouldn't have impressed me one way or the other.

20     Q.    One -- one of Ms. Bake's medications is the

21  medication Ultracet, is that correct?

22     A.    Mm-hmm.

23     Q.    Yes?

24     A.    I believe so.

25     Q.    And what are the properties of Ultracet?        1:45:19

0073

1  A. It's a pain medication.  I'm not sure if it

2 has a sedating medication with it.

3  Q. Did you give any consideration to the effect

4 of Ms. Bake's medications on her ability to work eight

5 hours a day?

6  A. No.  That's because she clearly was

7 functioning -- functioning without any challenge on  1:45:47

8 those medications eight hours or 24 hours a day.

9 Again, if she was cognitively impaired her doctors'

10 obligation is to restrict or revoke her license.  He

11 didn't do that.  Instead, he let this woman who can't

12 move her head go work 20 -- go drive 20 or 30 miles at  1:46:05

13 a time.  To me, that's pretty either generous or he's

14 confused or there's a litany of data just flowing here

15 that doesn't really make any sense.  But if she also

16 was impaired on Ultracet, then he would say, don't  1:46:22

17 drive on Ultracet.  She would, I'm sure, tell us that

18 she was not allowed to drive on Ultracet.  And last but

19 not least, if it's so sedating, why does he let her be

20 alone in a house -- a house that has stairs, bath --

21 rails, dogs, all sorts of things, fire, stove, poisons  1:46:40

22 -- he lets her be alone in a house and yet you're

23 asserting that Ultracet would make her cognitively

24 impaired.

25  So I'm asserting that the Ultracet did not make

0074

1   her cognitively impaired because she's repeatedly put          1:46:56

2   herself either voluntarily or with physician support in

3   harm's way despite using these medications.  Reality

4   has to speak in these files.  If the doctor said, I've

5   got you on Vicodin, you cannot drive.  If you drive you

6   can have -- fall asleep and have an accident am           1:47:19

7   responsible.  I will take your driver's license.

8   Patients with seizures have to have their license taken

9   away.  The doctor didn't do it.  He knew she was

10  driving.

11       Q.   You have no idea if Dr. Bergin told Ms. Bake,    1:47:33

12  when you're on the Ultracet don't dare operate a car,

13  do you?

14       A.   I am certain he did not because had he, he

15  would have recorded it permanently in his record, and

16  he did not do that at any time that I saw.  He would

17  cover himself must as much as he needs to, and that      1:47:47

18  would be in the permanent record.

19       Q.   That's just your assumption, isn't it?

20       A.   Well, it's I believe a really good one.

21       Q.   You had no indication in any of the records

22  that Ms. Bake was active for eight hours a day, did

23  you?

24       A.   I don't know what active means.

25       Q.   She wasn't getting dressed eight hours a day,

0075

1  was she?

2       A.    No.  She was --

3       Q.    She wasn't --

4       A.    -- sitting and watching TV.

5       Q.    She wasn't showering eight hours a day?

6       A.    No.  But she --

7       Q.    She wasn't cooking eight hours a day?          1:48:17

8       A.    No.  Forty-five minutes to an hour when she

9  was cleaning.

10      Q.    She wasn't with her dog outside eight hours a

11  day, was she?

12      A.    No.  She certainly wasn't doing nothing eight

13  hours a day.  She certainly wasn't taking to her bed

14  and being curled up in a fetal position under her bed.   1:48:34

15  She was definitely functional and out and about, by her

16  own admission.

17      Q.    What, if any, consideration did you give to

18  the self-report that Ms. Bake furnished which we marked

19  as I believe Exhibit 6?

20      A.    That she was functioning at an active -- at a   1:48:47

21  sedentary level at a minimum.

22      Q.    Do you have any reason to doubt any of the

23  statements that are contained in the -- it's Exhibit 6,

24  isn't it?

25      A.    Yes.

0076

 1     Q.   In the self-report which we marked as Exhibit

 2  6?

 3     A.   Whatever she -- some of things that she wrote    1:49:12

 4  about what she can and can't do and these pathologies

 5  that she has.

 6     Q.   You disagree with them?

 7     A.   Yeah.

 8     Q.   Which ones?

 9     A.   Well, whatever -- I mean she's -- she's

10  saying this just subjectively from her -- from what she

11  wants you to see.

12     Q.   How do you know they're incorrect?

13     A.   Loss of balance.  Later on it goes on to say    1:49:31

14  that she's fallen.  At no time is there anybody

15  examining the patient to document bruises, ecchymosis,

16  fractures, abrasions.  People who fall have sequelae

17  from falling.  She went to her doctor.  She went to a

18  doctor frequently.  She told her doctors everything.

19  She told her physical therapists everything, including

20  that she was able to prepare Easter dinner, and -- and

21  yet she's falling and the doctor wouldn't -- wouldn't

22  want to document it?  I don't know why.               1:50:05

23     Q.   Are you telling me you didn't see any notes

24  of falls in the records?

25     A.   Other than her saying that she's done it,

0077
1  nowhere was it quantifed or identified by the doctor.

2      Q.    But you did see notes that on examination she    1:50:20

3  had --

4      A.    No.

5      Q.    -- fallen --

6      A.    No.  No, no, no, no.  No.  One time in the

7  office un-isolation when she knew she was being

8  observed.

9      Q.    So is it your contention that she's just

10  making up these symptoms?

11      A.    I don't know.

12      Q.    How many times has Dr. Begin examined Ms.    1:50:38

13  Bake?

14      A.    Often.

15      Q.    And the number of times that you've examined

16  her is zero, correct?

17      A.    That's correct.

18      Q.    Did you note Dr. Bergen's finding that

19  basically all the discs in Ms. Bake's spine have some

20  degree of degeneration?

21      A.    Yes.  I do not know where he decided to come    1:51:00

22  up with that conclusion.  And that he attributes it to

23  her rheumatoid arthritis.  Where -- I don't even know

24  where that came from because it's with -- totally

25  without foundation.

0078

 1       Q.    Well, you never discussed it with him?

 2       A.    No, I didn't.  But you're taking it on faith       1:51:16

 3  and I'm taking it on un-faith.

 4       Q.    There was documented pathology of all levels

 5  of the spine, wasn't there?

 6       A.    There could have been.  I don't recall -- I

 7  don't -- I have not recently reviewed all of her MRI

 8  findings.  I don't believe the entire cervical spine       1:51:36

 9  was impaired.

10       Q.    There were findings in the cervical spine,

11  correct, on the MRI?

12       A.    Some levels, yes.  Some levels.

13       Q.    There were findings on the MRI of

14  degeneration in the thoracic spine?

15       A.    Okay.

16       Q.    Correct?

17       A.    I believe so, but I don't remember for sure.       1:51:51

18       Q.    And there were MRI findings of degeneration

19  in the lumbar spine, correct?

20       A.    Okay.  But not all five levels for certain.

21  So there were pathology.  Once again, even though that

22  would be objective, I mean if you'd like to see that,       1:52:06

23  it doesn't necessarily correlate clinically, or more

24  critically, functionally.

25       Q.    Are you saying that somebody has to have

0079

1   impairment of every level of their spine before you

2   would deem them to be incapable of working a sedentary

3   job?

4        A.   No.   I'm saying just because someone has         1:52:21

5   degenerative disc disease at L4-5 and L5-S1 does not

6   mean that that person is going to become dysfunctional,

7   does not mean that they're going to have pain, does not

8   mean that they need to have pain medications, does not

9   mean that they can't drive or do anything.   They can     1:52:31

10  have degenerative disc disease all they want to, and

11  it's objective and it's observable by everybody who

12  looks at the MRI or plain film.   Bottom line is it

13  doesn't necessarily mean it has anything to do with

14  that patient's ability to work or their functional

15  performance.   And I don't care if it's L5 levels or

16  just one, or if it's L23 or 33, however many vertebral

17  levels there are.

18             RECORDER:   I'm going to interrupt.   I have to    1:52:52

19  switch tapes.

20             (End Audiotape 1 - Begin Audiotape 2)

21             MR. RYAN:   Do you want to take a quick break

22  of maybe ten more minutes.

23             MR. DeBOFSKY:   Pardon me?

24             MR. RYAN:   Of maybe ten more minutes.   Or do

25  you want to just --                                          1:53:04

0080

```
 1              WITNESS:  Why don't we just keep going.

 2              MR. DeBOFSKY:  Okay.

 3              WITNESS:  Because I have another --

 4              MR. RYAN:  He's the boss.

 5              RECORDER:  You can continue.

 6              MR. DeBOFSKY:  Mark this as --

 7              RECORDER:  Mm-hmm.

 8              MR. DeBOFSKY:  -- 7, please.

 9      Q.   I show you what's been marked as your

10   deposition Exhibit 7.

11      A.   Mm-hmm.

12      Q.   Do you have any reason -- well, first of all,    1:53:32

13   was this a document that you were provided as part of

14   your file review?

15      A.   I am not 100 percent sure, but I believe so.

16      Q.   And in performing your assessment you were

17   looking solely at Ms. Bake's ability to perform a

18   sedentary job and not this job, correct?

19      A.   Most probably, yes.

20      Q.   Did you give any consideration to Ms. Bake's

21   age in performing your assessment?

22      A.   No.

23      Q.   Do you believe that age has any -- strike

24   that.  Would you consider age to be a factor at all in    1:54:17

25   assessing somebody's ability to work?
```

0081

1    A.    I might consider it, but again, it would

2  really depend on he whole picture.

3    Q.    Do you understand that Social Security

4  factors age into a disability evaluation?

5    A.    Now that you've told me.                    1:54:36

6    Q.    You didn't know that before?

7    A.    I -- never was something that really came up

8  to impact me.

9          MR. DeBOFSKY:  Would you mark this as 8?

10    Q.    The last document I'm going to show you.

11    A.    Mm-hmm.

12    Q.    What we've marked as Exhibit 8 for

13  identification.

14    A.    Mm-hmm.

15    Q.    Is this a document that you were provided?

16    A.    I believe so, yes.

17    Q.    Did you read it?

18    A.    Yes.

19    Q.    Did you take any of the statements contained

20  in Exhibit 8 into consideration in performing your

21  assessment?

22    A.    In some respects.

23    Q.    Which ones?

24    A.    I couldn't specify completely.  The -- I      1:55:33

25  reviewed what she had to say about her inability to do

0082

1    this and that.  "My stomach is constantly upset."

2    Okay.  Well, "my stomach is constantly upset," I guess

3    my next question would be how much weight has she lost,          1:55:53

4    and the answer I believe is zero.  So I'm not sure what

5    I'm supposed to do with that.  "My stomach is

6    constantly upset."  Am I supposed to be impressed

7    because she -- I guess so, and that I'm supposed to

8    look at someone whose stomach is constantly upset          1:56:07

9    leading to disability or impairment or whatever.  But

10   how does that translate into anything functional or --

11   or real or clinical?  If her weight loss hasn't gone

12   down -- or if her weight has not gone down -- there's

13   been no weight loss.  Is there diarrhea?  Is there          1:56:27

14   vomiting?  Is there anything like that going on?  If

15   there would, I would expect to see some other

16   diagnostics undertaken to see that.  So things like

17   that don't follow.

18        But the preponderance of stuff here, of all the          1:56:39

19   things that she says -- and that's really what it is,

20   she says -- about how dysfunctional she is, are not

21   borne out by the things that are recorded by the

22   multiple examiners that see her.  That's the issue.

23        Q.   Isn't that almost always the case that

24   doctors aren't preparing their records for the purpose

25   of disability evaluation?

0083
```
 1       A.    And that may be, but when he wants to write a
 2    note for you I would think he would want to record it,
 3    number one.  Number two, that's probably not always          1:57:1b
 4    true because Dr. Arnold I remember, specifically a note
 5    that she wrote, I don't remember when it was from,
 6    where she clearly identifies that the patient is
 7    sitting comfortable on the exam table and that she can
 8    ambulate and get about the exam room without any            1:57:27
 9    challenges.  The history as recorded by the doctor
10    should give an inter-reliable -- an inter-reliable
11    picture from one examiner to the other.  That's why I
12    don't need to see the patient.  And if the patient has     1:57:42
13    significant pathology outside of the normal, it needs
14    to be recorded.  And if the patient is seen to have
15    severe reconditioning or skin abnormality or grimaces
16    in pain on the exam table or can't rise from a seated      1:57:59
17    position or smells of alcohol or whatever, all of which
18    I have seen in various notes over the years, it needs
19    to be there.  However, it's never there by anybody.
20       Q.    Given what I you would characterize as
21    discrepancies between the records --
22       A.    Mm-hmm.
23       Q.    -- wouldn't your confidence in your opinion
24    be a lot stronger if you had examined the patient?
25       A.    That's not the process.  The process that I
```

0084
```
 1   do is review records for a company that has hired me to
 2   provide a thorough and unbiased and complete review of        1:58:36
 3   records and answer specific questions that they need to
 4   know for their claims processing.  You know, having the
 5   legal steps that we're doing now has happened extremely
 6   rarely and, you know, again, what happens next to my          1:58:52
 7   reports?  I rarely, as I said before, never see them.
 8   So sometimes that would help, but there is issues of
 9   independent evals where issues of bias or whatever are
10   asserted.  You know, I don't know.  I don't know how
11   CIGNA or LINA does their -- does their business.  And I
12   did, you know, something that they hired me to do.
13        Q.   Let me ask the question a different way.
14   Wouldn't you be more confident with your opinion if you
15   had actually spoken with the doctors?
16        A.   Possibly.  I'm sure Dr. Arnold would have --       1:59:36
17   would have corroborated her very thorough notes to
18   support that she did not think the patient was totally
19   disabled, and I don't know about Dr. Bergin.  But most
20   critically, since the vast majority of doctors have no
21   idea what total disability means or partial work and          1:59:53
22   stuff, because they are not familiar with the
23   workplace, or even DOT or Department of Labor
24   guidelines, your average doctor who opines about a
25   patient's ability to work or not ability to work or
```

0085

```
 1   total disability does so at great peril since he or she    2:00:08

 2   does not really understand what that means and

 3   typically has no familiarity with the workplace.

 4   Occupational medicine physicians do.

 5       Q.   Don't you believe that you could have asked

 6   the treating physicians very pointed questions about

 7   their clinical findings?

 8       A.   I might have.  But that would presuppose that

 9   the doctor, you know, would talk to me.  And obviously

10   they chose not to.

11       Q.   Well, how do you know that they chose not to?

12       A.   They didn't call me back.                         2:00:48

13       Q.   You made two calls to each doctor's office.

14       A.   Mm-hmm.

15       Q.   You didn't furnish them with any

16   authorization.

17       A.   Mm-hmm.

18       Q.   In the age of HIPAA do you think it's

19   responsible for a doctor to call somebody and discuss a

20   patient's medical condition without authorization?

21       A.   Assuming any of that were true and they         2:01:13

22   wanted to speak to me because they're so dedicated to

23   their patient, have a staff member do that.  Call back

24   and say, I -- Dr. Jones says he can't talk to you until

25   you furnish a permission to talk form, or whatever.  No
```

0086

1   one 3ever did that.  Or the idea that they were trying          2:01:31

2   to help the patient I would think would induce them to

3   call me to discuss it if they had another chance to --

4   to provide a picture.

5       Q.   Between your report and what we've discussed

6   this morning and into the early afternoon, have we             2:01:51

7   covered all of the opinions that you have with respect

8   to this matter?

9       A.   Yes, I believe so.  I mean everything that

10  you addressed is just from materials that I've looked

11  at.  I -- I do not know this claimant.  I do not know           2:02:04

12  the doctors or any of the CIGNA people.

13      Q.   Are there any opinions that you've given that

14  you would like to change at this time?

15      A.   No.

16           MR. RYAN:  You're -- you're including his --

17  his report in its entirety I would imagine, right,

18  Mark?

19           MR. DeBOFSKY:  And his testimony.

20           MR. RYAN:  Right.

21           MR. DeBOFSKY:  If I could just have a minute

22  to review my notes.  I think we're done here.

23           MR. RYAN:  We'll take a quick break.

24           RECORDER:  Off the record at 12:53.

25                        (Off the record.)

0087

1              RECORDER:  Back on the record at 12:57.

2              MR. DeBOFSKY:  Can you mark this as 10?

3              MR. RYAN:  What is it, 9?

4              RECORDER:  Yes.

5        Q.   Doctor, I'm showing you what we've marked as

6    your deposition Exhibit 9 for identification.  Are you

7    familiar with this text, "Disability Evaluation"?

8        A.   No.

9        Q.   If you could turn your attention to the page

10   that's -- it's the third page, which is 102 at the top.

11       A.   Mm-hmm.

12       Q.   Under the heading, "Physical Examination."

13       A.   Yes.

14       Q.   Do you agree with this sentence, "A sound and

15   skillful physical examination is a necessary component      2:03:19

16   of the standard ME and the IE?"  ME is medical

17   examination and IE is impairment evaluation.

18             MR. RYAN:  Objection, calls for speculation.

19   You're showing him a document he's never seen before       2:03:35

20   and asking him to take a single sentence presumably out

21   of context and ask whether he agrees or disagree with

22   it.  But objection as to form and vague and ambiguous.

23   But Doctor, if you're comfortable answering the

24   question, please proceed.                                  2:03:49

25       A.   I would add sound, skillful and accurate

0088

1   physical exam is a necessary component of a standard

2   medical exam and assessment of impairment, if I wanted

3   to provide a quantitative assessment of a patient's

4   impairment.

5       Q.   Okay.

6            MR. DeBOFSKY:  That's all the questions I        2:04:07

7   have.

8            MR. RYAN:  All right.  I just have a couple

9   followup questions, Doctor.

10  BY MR. RYAN:

11      Q.   If you could turn to the document which is

12  titled "First Vice President - Operations Analysis,"

13  which has been marked --

14      A.   Seven.

15      Q.   -- Exhibit 7.  I think you indicated on

16  direct examination by Mr. DeBofsky that this is

17  something that you recall having received at the time

18  you did the work on this case, that is --

19      A.   Yes.

20      Q.   -- your review?  I direct your attention to

21  the second page, specifically the section titled,

22  "Essential Physical Requirements."  What -- what is

23  your assessment as to the type of physician this is at

24  CORUS Bank in -- in terms of whether it's sedentary,

25  light duty, medium duty, etcetera?

0089

1    A.    Sedentary.

2    Q.    Okay.  And in your opinion, was Ms. Bake

3  capable from a functionality standpoint and otherwise

4  of performing the material duties and responsibilities

5  of this position?

6    A.    The only thing -- it says ability to sit

7  and/or stand for long periods of time.  I would say          2:05:34

8  that she would have needed a stretching break every

9  hour for sit -- being seated and probably shouldn't

10  have to stand for more than an hour without a break of

11  say five minutes.  But other than that, I don't see any     2:05:47

12  reason.

13         MR. RYAN:  Thank you.  No further questions.

14

15  BY MR. DeBOFSKY:

16    Q.    You never assessed Ms. Bake with respect to

17  the six bullet points listed under "Essential Physical

18  Requirements," did you?

19    A.    In terms of directly applying this against --     2:06:02

20    Q.    Yes.

21    A.    No.

22         MR. DeBOFSKY:  That's all I have.

23         RECORDER:  We're off the record at 1 o'clock.

24

25

0090

```
1                          CERTIFICATION

2          I certify that the foregoing is a correct

3      transcript from the record of proceedings

4              in the above-entitled matter.

5

6

7              Sharon Roberta Vietoris

8                  May 15, 2008
```